**James M. CROUSHORN**

v.

**BOARD OF TRUSTEES OF UNIVERSITY OF TENNESSEE and the University of Tennessee.**

**James M. CROUSHORN**

v.

**Horace BASS, Ben T. Granger, and the University of Tennessee.**

No. 76–316–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 19, 1980.

George C. Paine, II, Nashville, Tenn., for plaintiff.

R. A. Ashley, Atty. Gen., State of Tenn., Nashville, Tenn., William J. Haynes, Jr., Asst. Atty. Gen., Beauchamp E. Brogan, Gen. Counsel, University of Tennessee, Ronald C. Leadbetter, Knoxville, Tenn., for defendants.

MEMORANDUM

MORTON, Chief Judge.

Plaintiff James M. Croushorn instituted two actions in this court, which have been consolidated for trial. In the first action, plaintiff, a white male, claims that his employers, the University of Tennessee (the University) and its Board of Trustees, discriminated against him on the basis of race in violation of 42 U.S.C. § 2000e–2 and that they retaliated against him by discharging him in violation of 42 U.S.C. § 2000e–3. During trial plaintiff withdrew his claim of reverse racial discrimination, leaving only the retaliatory discharge claim for consideration by the court. Plaintiff seeks compensatory damages, attorney's fees, and injunctive relief in this first cause. In the second action, plaintiff contends that defendants Horace Bass, former Commissioner of Human Services for the State of Tennessee, Ben P. Granger, Dean of the School of Social Work of the University (UTSSW), and the University infringed upon his first amendment rights in violation of 42 U.S.C. §§ 1983, 1985, and 1986. In this action, plaintiff seeks compensatory damages, punitive damages, attorney's fees, and injunctive relief. Prior to the filing of the first action, plaintiff fulfilled all statutory prerequisites for Title VII suits. Jurisdiction over both these causes is predicated upon 28 U.S.C. § 1343.

## I. THE EMPLOYMENT DISCRIMINATION CLAIM

### A. FACTS

In September 1974, plaintiff commenced his employment as an assistant professor of social work on the faculty of the Nashville branch of the UTSSW. His annual salary was $14,500. At the same time, Dr. John Colen, a black male, and Ms. Josephine Allen, a black female, also joined the faculty of UTSSW. During his first quarter of employment, plaintiff became aware that Colen had been hired as an associate professor, the rank above assistant professor, despite his lack of teaching experience.

Plaintiff, who also had not previously taught, decided to investigate the matter further to determine whether there was inequity between his salary and Colen's. In order to obtain information, plaintiff checked the public records at the Tennessee Higher Education Commission. Although Colen's salary was not listed, plaintiff learned that Allen, who was also in her first teaching position, was receiving a salary of $16,500. Since Allen had been hired as an assistant professor, plaintiff speculated that Colen's salary as an associate professor was equal to or greater than Allen's. Plaintiff believed that he, Allen, and Colen were all performing virtually identical jobs. None of them had teaching experience, and only plaintiff and Colen had received their doctorate degrees. Plaintiff therefore believed that he was more highly qualified than Allen and that he and Colen were equally qualified. See Trial Transcript, at 53, 55. Based on this information, plaintiff concluded that there was inequity among the three salaries, and he decided that the differences resulted from reverse racial discrimination against him.

In early December, plaintiff contacted Colen and Allen to inform them that he intended to raise the matters of salary inequity and reverse racial discrimination formally with Dean Granger, the Department of Labor, and the Equal Employment Opportunity Commission. After Colen and Allen expressed to Dean Granger their concerns about plaintiff's activities, the dean and Dr. Bonovich, the director of the Nashville branch of the UTSSW, called plaintiff to question him about his complaints. They also related their extreme dissatisfaction that plaintiff had not confronted the administration with the problem before contacting other faculty members. Plaintiff stated that he was preparing a letter containing his allegations of salary inequity and that he would soon mail it to them. After receiving the letter, Dean Granger and Dr. Bonovich met with plaintiff to discuss the reverse discrimination complaint and also the manner in which plaintiff had pursued it. The conference was unproductive. The administrators primarily emphasized the inappropriateness of plaintiff's discussing salary complaints with Colen and Allen. The dean made no effort to explain that Colen and Allen were considered more highly qualified than plaintiff and thus entitled to higher salaries, but instead he insisted that no discrimination had occurred. Plaintiff, however, continued to believe that he was a victim of reverse discrimination.

In February 1975, Dr. Bonovich, following normal University procedures, prepared an annual "Academic Evaluation Form" on which plaintiff's professional performance was appraised. Dr. Bonovich rated plaintiff "satisfactory" overall, "satisfactory" or better on nine separate areas of evaluation, and "unsatisfactory" in one category designated as "institutional commitment." See Trial Exhibit P–9. Although Dr. Bonovich made no recommendation about whether or not plaintiff should be retained for the next academic year, he assumed that based on the evaluation plaintiff would be retained. See Trial Transcript, at 444.

Dr. Bonovich based his "unsatisfactory" rating in the area of institutional commitment primarily on the manner in which plaintiff proceeded with his salary complaint and an earlier grievance concerning Bonovich's handling of a security problem at Clement Hall, the facility housing the UTSSW. The Clement Hall incident had erupted when Bonovich assigned each male faculty member the responsibility of supervising the closing of the building one evening every two weeks. Plaintiff immediately objected to this assignment as an encroachment on his time and in writing refused to participate. See Trial Exhibit D–7. In a memorandum Bonovich explained to plaintiff that he could not simply refuse to participate but that he could appeal Bonovich's decision to the Dean. Plaintiff wrote several comments on this memorandum labeling Bonovich's conduct as authoritarian and calling for a discussion of the issue at the next meeting of the faculty, and he circulated copies to the male faculty members. Id. Bonovich again informed plaintiff of the proper method of

reviewing an administrative decision of the branch director and advised him that neither formal nor informal review by the faculty was appropriate. *Id.* The issue was ultimately resolved when male and female faculty members volunteered to perform the assignment.

Dean Granger, who was aware of plaintiff's salary complaint and the Clement Hall episode, informed plaintiff that he believed that Bonovich's evaluation of plaintiff had been too generous in some areas; he did not, however, indicate whether or not he would recommend that plaintiff be retained for the next academic year. On February 17, 1975, plaintiff contacted Granger by telephone to inquire whether he had made a decision on retention, and Granger stated that he had not. Plaintiff then advised Granger that he intended to file the next day a formal EEOC charge against the University on the ground of reverse racial discrimination. The following day, February 18, plaintiff filed the charge, by mail, with the EEOC; he also sent a copy to Dean Granger. On the same day, Granger, with full knowledge of plaintiff's intention to file the charge, recommended to Dr. Smith, the Vice Chancellor of Graduate Studies, that plaintiff not be retained on the faculty the following year. In justifying the recommendation, Granger noted that

> [u]p until recently Mr. Croushorn had not gone through administrative channels or the established University process in discussing [his] grievances. For example, he has initiated reverse discrimination charges without initially discussing the matter with the Dean or with [the] University administration.

*See* Trial Exhibit P–11; Stipulations, No. 17 (filed June 11, 1979). The next day, Granger revised the evaluation made by Bonovich and inserted his own evaluation of plaintiff as "unsatisfactory" overall. In explanation, Granger wrote:

> Mr. Croushorn has been extremely uncooperative. He has been unwilling to accept certain branch assignments as a member of the faculty. There have been specific situations where he initiated ac-

tion without first discussing the concern with Dr. Bonovich or myself, or through University processes.

> Although he may have qualities of good teaching, he has been very difficult to work with and insists on going outside of University procedure on issues that he disagrees on.

*See* Trial Exhibit P–9; Stipulations, No. 18 (filed June 11, 1979). On February 25, plaintiff received notification, by letter dated February 20, that he would not be retained and that his duties would end with the close of the spring quarter. On March 4, plaintiff filed an additional charge with the EEOC alleging that the University had discharged him in retaliation for his filing the discrimination complaint with the EEOC.

Plaintiff simultaneously commenced an appeal of the nonretention decision through the University's appeals apparatus, based, in part, on his claim that tenured faculty at the Nashville branch were not consulted in the making of the nonretention decision as required by the University handbook. The tenured faculty supported plaintiff's claim and urged the repeal of the decision on this ground. In April, plaintiff, his attorney, the University's attorneys, Dean Granger, Dr. Bonovich, and Dr. Smith met to discuss plaintiff's claim concerning that failure to follow handbook procedures. After reviewing the situation, Dr. Smith concluded that proper procedures had not been followed and ruled that the nonretention decision would have to be rescinded. *See* Trial Transcript, at 524. In light of Dr. Smith's determination, plaintiff's attorney stated that the retaliation charge pending before the EEOC would probably be moot, and he indicated that he would therefore seek to have it terminated. Withdrawal of the charge, however, was in no way a bargained-for consideration for the University's rescinding the nonretention decision. Dr. Smith would have ruled in plaintiff's favor even if there had been no mention of withdrawing the EEOC complaint. *See* Trial Transcript, at 524–256.

Plaintiff's attorney subsequently requested the EEOC to terminate the retaliatory discharge complaint. *See* Trial Exhibit P–25. The EEOC never gave its consent to the attempt to withdraw the charge, and it subsequently issued plaintiff a right-to-sue letter. *See* Trial Exhibit P–50.

Dr. Smith's decision to rescind the earlier nonretention of plaintiff came after the deadline established by University regulations for notifying a faculty member of his nonretention, and so it was impossible to terminate plaintiff's employment at that point. Therefore, plaintiff was retained for the 1975–76 academic year. Plaintiff was thereafter reappointed to serve on the faculty for the 1976–77 academic year, however, after receiving an overall "satisfactory" evaluation from Dr. Bonovich on March 9, 1976, in which Dean Granger concurred. *See* Trial Exhibit P–26.

■■■ Since Dr. Smith rescinded the nonretention decision before it became effective, plaintiff did not lose a single day of work during the 1974–75 academic year. Plaintiff was, however, denied employment in the UTSSW's summer school program for which appointments were made in the interim between the nonretention decision and its rescission. According to plaintiff's testimony, prior to receiving the notice of nonretention, he had been told by Mr. Orten, the director of the summer school, that he could teach in the program. *See* Trial Transcript, at 30, 88.[1] Plaintiff was aware that his appointment was subject to the final approval of Dean Granger, but he had been assured by Orten that Granger had in the past always approved Orten's recommendations and that Orten intended to recommend plaintiff's selection. *See* Trial Transcript, at 88. Granger himself corroborated this by testifying that he based his decisions concerning the appointments on Orten's recommendations. *See* Trial Transcript, at 192. After receiving the notice of nonretention, plaintiff asked Orten whether he could still teach in the summer school, and Orten reported that Granger had said that he could not have the position. *See* Trial Transcript, at 117–18. Defendants offered no evidence that Dean Granger would have acted contrary to his previous practice of following Orten's advice by denying plaintiff the summer school employment regardless of disposition of the retention question. The court therefore finds that but for the nonretention decision, plaintiff would have received the summer teaching position.[2]

## B. TITLE VII VIOLATION

■■■ After receiving his right-to-sue letter, plaintiff brought this action based upon Title VII of the Civil Rights Act of 1964. Section 704(a) of the Act, as now codified in 42 U.S.C. § 2000e–3(a), provides in pertinent part that

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court of the United States established guidelines for the "order and allocation of proof in a private, non-class-action challenging employment discrimination." As summarized by one authority, under *McDonnell Douglas*

[t]he plaintiff must establish a prima facie case of retaliation. The defendant must come forward with a legitimate, nondiscriminatory explanation for its con-

---

1. Plaintiff's testimony of what Mr. Orten told him is admissible, for the truth of the matter asserted by Orten, under rule 801(d)(2)(D) of the Federal Rules of Evidence. Orten was unquestionably the agent of defendants, and since he was the director of the summer schools, his statements about summer school employment were within the scope of his agency and were made during the existence of the agency relationship.

2. Plaintiff has alleged that he lost $4,833.34 in salary as a result.

duct, and, if the defendant succeeds, the plaintiff must demonstrate that the supposed nondiscriminatory reason for the action "was in fact pretext."

*B. Schlei & P. Grossman, Employment Discrimination Law* 436 (1976) [hereinafter cited as *Schlei & Grossman*]. The *McDonnell Douglas* Court recognized that the elements of plaintiff's prima facie case would vary according to the factual situations presented, *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, 36 L.Ed.2d at 677–78, and the lower federal courts have employed several different formulations of the required showing. *See, e. g., Romero v. Union Pacific R. R.*, 459 F.Supp. 741 (D.Wyo.1978); *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1325–26 (S.D.Ohio 1978); *Mead v. United States Fidelity & Guaranty Co.*, 442 F.Supp. 114, 129–30 (D.Minn.1977); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318 (D.Mass.1976). This court believes that in order to make out a prima facie case in the retaliation context, a plaintiff must show (1) that he belonged to the class protected by Title VII; (2) that he was qualified for the position that he sought or that he held at the time of the retaliation; (3) that he engaged in an activity protected by 42 U.S.C. § 2000e–3(a); (4) that the employer knew that plaintiff engaged in such an activity; (5) that subsequently plaintiff was discharged or subjected to other damage; (6) that the employer acted with a retaliatory motive; and (7) that at the time of the retaliation the employer had no intention to eliminate the position that plaintiff sought or held.[3]

In this case plaintiff has clearly carried his burden of proving a prima facie case. Several of the elements are undisputed. Plaintiff, as an employee of the University, was unquestionably a member of the protected class. That plaintiff was qualified for the position of assistant professor was evidenced not only by the fact that plaintiff was retained for the 1976–77 academic year, but also by the direct testimony of Dean Granger. See Trial Transcript, at 155. Plaintiff told Granger that he intended to file a charge of reverse discrimination with the EEOC, and he contends that making that statement and subsequently filing the charge were activities protected by § 2000e–3(a). There is no question that his employer knew that plaintiff planned to make such a charge, nor that subsequently plaintiff was discharged in that he was notified that he would not be retained for the following academic year. Furthermore, no evidence was introduced that defendants at any time considered eliminating plaintiff's position.

### 1. *Retaliatory Motivation*

Two crucial issues are disputed, however. The first is whether or not defendants acted with a retaliatory motive when they decided not to retain plaintiff on the faculty for the 1975–76 academic year. The focus of this inquiry is on whether the notice of nonretention was causally connected with plaintiff's announcement to Dean Granger that he intended to file an EEOC charge. For purposes of plaintiff's prima facie case, the court believes that the inference arising from the timing of the nonretention decision is alone sufficient proof of retaliatory motive. *See, e. g., Sutton v. National Distillers Products Co., supra*, 445 F.Supp. 1319 (S.D.Ohio 1978); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc., supra*, 425 F.Supp. 318 (D.Mass.1976).

Defendants have attempted to meet plaintiff's prima facie showing on this element by articulating legitimate nondiscrim-

---

**3.** Proof of the employer's *intent* to discriminate is not necessary to establish a violation of 42 U.S.C. § 2000e–3 and thus is not listed as an element of the prima facie case. *See Mead v. United States Guaranty & Fidelity Co., supra*, 442 F.Supp. at 129. As stated by the United States Supreme Court, "Congress directed the thrust of [Title VII] to the *consequences* of employment practices, not simply the motiva-

tion." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971) (emphasis in original). Since retaliation has the natural effect of discouraging employees from exercising their rights under Title VII, it is presumed that employers who retaliate intended such consequences. *See Mead v. United States Fidelity & Guaranty Co., supra.*

inatory reasons for the nonretention. Conceding that they had knowledge that plaintiff intended to file a charge, defendants contend that this did not influence their action. Instead they claim that plaintiff was nonretained because of the manner in which he pursued his salary inequity and Clement Hall complaints. Defendants' witnesses testified at length on the inappropriateness of plaintiff's contacting Colen and Allen about his salary concerns prior to presenting the matter to the UTSSW administration. Some evidence was also introduced about the proper manner for processing such complaints through the administration of the University. From the record it is abundantly clear, however, that the ostensible rules proscribing the discussion of salary matters with faculty members and prescribing the manner for processing certain grievances within the University were nothing more than customs that were unwritten, unpublicized, and, to plaintiff, unknown. Therefore, the court rejects defendants' theory in its entirety.

█ Undoubtedly, plaintiff had exercised poor judgment in several of his dealings with his superiors, and Granger and Bonovich were on occasion exasperated with plaintiff's actions. Nevertheless, the ineluctable conclusion is that these pretexts were not the true reasons for the nonretention decision. First, Bonovich, the administrator who had to work the most closely with plaintiff, was well aware of plaintiff's allegedly obnoxious behavior at the time that he completed his evaluation of plaintiff's performance; in spite of this knowledge, Bonovich awarded plaintiff an overall "satisfactory" rating and assumed that on the basis of his evaluation, plaintiff would be retained. Furthermore, before plaintiff told Granger that he would file an EEOC charge, Granger, who was fully cognizant of the controversies that plaintiff had fomented, was undecided on the retention question; immediately after plaintiff made his intention known, Granger made the decision not to retain plaintiff. The clear and reasonable inference arising from those facts is that plaintiff's plan to utilize the EEOC's complaint mechanism was the principal reason for his nonretention. Moreover, the court believes that defendants' insistence that they were unhappy only with the manner in which plaintiff proceeded with his grievances is a mere coverup for their actual displeasure with his intention to go to the EEOC. "Any statements which indicate that the employer was displeased with the fact that the employee actively protested Title VII discrimination, or that the employer punished the employee because it objected to the 'form' which the opposition took, constitute significant direct evidence of retaliatory motive." *Schlei & Grossman* 438. In light of all the evidence, the court concludes that notwithstanding his faults, plaintiff would not have received a notice of nonretention had he not stated his intention to file the charge. That statement was the principal, if not the sole, factor in the nonretention decision.[4] Therefore, by a preponderance of the evidence, plaintiff has proven that defendants acted with a retaliatory motive.[5] *See, e. g., Sut-*

---

4. Since plaintiff has satisfied this very stringent standard in proving the causal connection between his stating an intention to file an EEOC charge and defendants' decision not to retain him, there is no occasion to consider whether a less demanding burden of proof would be sufficient. The court would note, however, that several cases have held that a plaintiff merely need prove that retaliatory discrimination on the part of the employer contributed among other things to cause the discharge. *See, e. g., Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 545 F.2d 222 (1st Cir. 1976); *Mead v. United States Fidelity & Guaranty Co., supra*, 442 F.Supp. at 131.

5. In light of the court's conclusion on this issue, defendants' reliance upon *Johnson v. Fulton Sylphon Division, Robertshaw Controls Co.*, 439 F.Supp. 658 (E.D.Tenn.1977), is misplaced. The court there stated that

[t]he discharge of an employee after he has filed charges with the EEOC and after he has sued his employer under Title VII should be viewed with suspicion. On the other hand, an unsatisfactory employee should not be entitled to insulate himself from justifiable disciplinary action merely because he has filed charges of discrimination against his employer and has followed up by filing suit. *Id.* at 670. In that case the court determined as a factual matter that the plaintiff had been

ton v. National Distillers Products Co., supra, 445 F.Supp. at 1328.

### 2. Protected Activity

■ Another major disputed issue remains in this phase of the case. In order to decide that this retaliation amounted to a violation of 42 U.S.C. § 2000e–3, the court must find that plaintiff was engaged in a protected activity when he formed the intention to file the EEOC charge and expressed that intention to his employer. The statute gives immunity to two types of activities. See Schlei & Grossman 416. "Opposition" is protected by the clause that prohibits employers from discriminating against an employee because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). The "participation" clause forbids discrimination against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Id. Whether an activity was "opposition" or "participation" is often of critical importance in Title VII retaliation cases because the scope of protection afforded by the two clauses is different. While the "participation" clause covers a narrower range of activities than the other, it gives those activities stronger protection than the "opposition" clause provides. See, e. g., Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978); Hearth v. Metropolitan Transit Commission, 436 F.Supp. 685, 687 (D.Minn.1977).

The unique circumstances here presented make difficult the determination of which of the clauses is applicable. Therefore, the court has chosen to analyze the facts under both clauses; the court concludes that plaintiff would prevail under either.

■ As a preliminary matter under the "participation" clause, the court would note that "[a]n employee need not establish the validity of his original claim to establish a charge of employer retaliation for having made the original charge or otherwise engaging in conduct protected by [the 'participation' clause]." EEOC v. Kallir, Philips, Ross, Inc., 401 F.Supp. 66, 70 n.6; see, e. g., Sias v. City Demonstration Agency, supra, 588 F.2d at 695; Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969). Therefore, the fact that plaintiff dropped his complaint of reverse discrimination during trial and conceded that he could not bear his burden of proof on that issue is of no consequence to the success or failure of his retaliation claim under the "participation" clause. See Trial Transcript, at 467.

■ The difficult question is whether or not plaintiff's conduct is covered by the "participation" clause at all. Most cases arising under this clause have involved retaliatory acts against an employee that occurred subsequent to his filing of a charge with the EEOC, see, e. g., Pettway v. American Cast Iron Pipe Co., supra, or some other appropriate agency, see, e. g., Hicks v. ABT Associates, Inc., 572 F.2d 960, 969 (3d Cir. 1978); [6] EEOC v. Kallir, Philips, Ross, Inc., supra. Thus, were the sequence of events different, and plaintiff had filed the EEOC charge and notified defendants of that fact before defendants made the non-retention decision, the case would clearly fall within the ambit of the "participation" clause. At the time of the conduct that provoked the reprisal in this case, however, no "investigation, proceeding, or hearing" concerning plaintiff's reverse discrimination claim was pending before the EEOC or any other agency. The court's inquiry must therefore focus upon whether the "participation" clause protects an employee who has formed a definite intention to file an EEOC charge, whose employer learns of this intention and retaliates because of it, and who actually does file the intended

---

discharged not because of his assertion of federal statutory rights, but because of his failure to perform his job in a satisfactory manner. This is not such a case. But for his assertion of his federal statutory rights, plaintiff would not have received the notice of nonretention.

**6.** But cf. Sias v. City Demonstration Agency, supra. (Court assumed sub silentio that writing a letter to HUD complaining of employment discrimination was "opposition" not "participation").

charge the next day. Because of the "exceptionally broad protection"[7] intended by Congress under this section, evidenced by the inclusion of the expansive terms "assisted" and "participated,"[8] the court believes that plaintiff's conduct is covered by this clause.

The lack of a pending formal charge before the EEOC or some other body does not necessarily defeat plaintiff's claim under this clause. There is nothing talismanic about the filing of a charge. In *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978), the court held that an employee who did not communicate with a government agency about her discrimination claim or even threaten to do so until three days after her discharge could not establish a retaliatory discharge claim under the "participation" clause. Although the court noted a distinction between cases in which a charge is filed prior to the discharge and in which the charge is not filed until afterward, it recognized implicitly that this distinction is important only insofar as it promotes the primary rationale of the clause:

> The issue addressed by this subsection is the employer's motivation, permissible or impermissible, in discharging the employee. Obviously, if a charge is not filed with the EEOC until after the discharge, the latter cannot be motivated by a desire to retaliate for the former.

*Id.* at 143. If an employer learns, as did defendants in this case, that an employee intends to file a charge and discharges the employee for that reason, however, it is obvious that the employer was motivated by a desire to retaliate because of the employee's invocation of the Title VII complaint procedure. The motivation is the same whether the charge has actually been filed or is simply imminent. Thus the case at bar is distinguishable from *Silver* and any other case in which the employee's intent to file a charge is inchoate and unarticulated at the time of the retaliation. Not only did plaintiff have a definite intent to file a charge, he also communicated that intent to his employer and actually filed the charge. Shortly thereafter, plaintiff was notified that defendants had decided to terminate his employment at the end of the academic year. Unquestionably, defendants were motivated by a desire to punish plaintiff in anticipation that he would act in furtherance of his intent.

The lack of a pending EEOC charge is thus not only not a controlling consideration, it is generally inconsequential as long as the reprisal is animated by the requisite improper motivation. Still, when the conduct of the plaintiff that produces the retaliation predates the actual filing of a charge, that conduct must have a sufficiently close connection with EEOC charge-filing before it will be protected by the "participation" clause. The court must therefore determine whether plaintiff's conduct was so connected.

The court begins with the general and well-settled propositions that the purpose of the "participation" clause is to protect all forms of access to the EEOC, *see Schlei & Grossman* 418, and that resort to the EEOC to vindicate equal employment rights is to be encouraged.[9] These consider-

---

7. *See Pettway v. American Cast Iron Pipe Co., supra,* 411 F.2d at 1006 n. 18.

8. These terms, unlike the terms "made a charge" or "testified," are not obviously definable in the context of this statute and are largely undefined by judicial interpretation. Courts have not always taken care to specify whether a particular claim is cognizable under the "participation" or "opposition" clause. *See generally Eichman v. Indiana State University Board of Trustees,* 597 F.2d 1104 (7th Cir. 1979); *Berio v. EEOC,* 18 FEP 1213 (D.D.C.1979); *Hunter v. Stetson,* 444 F.Supp. 238 (E.D.N.Y.1977); *Kornbluh v. Stearns & Foster Co.,* 73 F.R.D.

307 (S.D.Ohio 1976). *But cf. Silver v. KCA, Inc.,* 586 F.2d 138 (9th Cir. 1978) (comparison of the two clauses made); *EEOC v. Johnson Co.,* 18 FEP 896 (D.Minn.1978) (extensive discussion of whether a *threat* to file a charge with the EEOC constituted "participation" or "opposition"). Authoritative discussions of the breadth of the terms "assisted" and "participated" are thus almost nonexistent.

9. *But cf. Sias v. City Demonstration Agency, supra,* 588 F.2d at 695 (narrow interpretation of the *"opposition"* clause "would tend to force employees to file formal charges rather than

ations dictate that broad immunity from retaliation be provided "to ensure the effective implementation and maintenance of the statutory mechanism for protection of [those] rights . . . ." *Mead v. United States Fidelity & Guaranty Co., supra,* 442 F.Supp. at 129 (D.Minn.1977). Accordingly, persons actually utilizing EEOC procedures are protected for their own sakes, and also to prevent a chilling effect on the exercise of equal employment rights by others who are considering filing charges or taking part in the prosecution or presentation of such charges.[10] *See, e. g., id.* at 132. Likewise, conduct that predates or falls short of the actual filing of a charge deserves "participation" clause protection if it is an intimately related and integral step in the process of making a formal charge. Therefore, the determination of whether conduct falls within or without this protected area must be based on two factors: the necessity of the conduct to formal charge filing and the effect that retaliation for that conduct would have on recourse to the EEOC procedures.

 As has been repeatedly stated, defendants retaliated against plaintiff because he intended to file a formal charge. The fact that he informed Dean Granger of his intention was merely incidental.[11] It should be readily apparent that before an employee can make a formal charge, he must form the requisite intent to do so.

That intent essentially gives life to the act of filing a charge. Without it, no charge would be filed by the employee. Therefore, the "necessity" of plaintiff's conduct is clear. The effect of retaliation against those who intend to file charges is also easily imaginable. Because forming the intent is necessarily part and parcel of filing a charge, retaliation aimed at punishing those who intend to complain to the EEOC would have a chilling effect as great as that caused by a reprisal against one who has already filed a charge. The threat of unremediable retaliation against those who file charges is an unquestionable deterrent to the exercise of those rights, *see, e. g., id.,* and so such retaliation is specifically prohibited by the statute. If, however, an employer could with impunity retaliate against an employee who, it is discovered, plans to file a charge, or who is writing a letter or completing a charge form to send to the EEOC, the protection of the "participation" clause would be dramatically undermined. The court thus concludes that the conduct for which plaintiff was penalized was an intimately related and integral step in the process of filing a charge, and that it is protected by the "participation" clause.

Despite what logic would seem to dictate, this interpretation could not be adopted if unsupported by the language of the clause itself. Congress used broad language when drafting this statute, however, and the court believes that the conduct in question

seek conciliation or informal adjustment of grievances").

**10.** This consideration partially accounts for the immunity given persons who file utterly false and frivolous EEOC complaints. *Pettway v. American Cast Iron Pipe Co., supra.*

**11.** It is, of course, not necessary to the process of filing a charge for an employee to communicate his intent to his employer, fellow employees, or others. The court does not believe, however, that an employee should be under a duty to prepare his charge in a secretive and clandestine manner. The form of the employee's communication of his intent should, perhaps, be a relevant consideration. If, as here, the employee discreetly informs only his employer that he intends to file the charge, the communication itself must be considered unimportant. In such a case, the employer's reprisal will not be based upon an objection to the

fact that the employee revealed his intention, but will occur instead because he is offended by that intention. The employee's participation in the EEOC process is implicated in this instance, and so the participation clause should provide the protection. When the communication is more public, hostile, or disruptive of the employer's business, however, it may tend to acquire a life of its own and may well become the motivating force underlying the employer's reaction. In that event, the communication itself becomes a form of opposing the perceived unlawful employment practice and should in some circumstances be protected only under the opposition clause. In all cases, the intent of the employee and the motivation of the employer should control the outcome, not the manner in which the employer learns of the employee's intent.

here easily fits into the categories of "assisting" or "participating" in EEOC proceedings. Those two terms are undefined in the statute, *see* note 8, *supra*, and must be read in light of the overall purpose of the clause as outlined in the foregoing discussion. Forming the intent to do an act clearly "assists" the performance of that act. Thus the statutory language supports the court's analysis.

The court has located only one reported decision that involved a similar factual setting. In *EEOC v. Johnson Co.*, 18 FEP 896 (D.Minn.1978), the court held that an employee's threat to file an employment discrimination charge was not eligible for the strong protection of the "participation" clause, but was sheltered, if at all, by the more limited "opposition" clause. The employee had written a letter to her employer setting forth her various complaints and concluded: "I have talked with the State Human Rights Commission . . . . I have the complaint made out—It's up to you if I file it." *Id.* at 899. The employer discharged the employee immediately upon receiving the letter. Although recognizing that the "participation" clause shields all forms of access to the EEOC, the court stated that "threats are something short of recourse to the [EEOC] machinery." *Id.* at 902. The court reasoned that

> [t]hreats are wont to occur in many forms and in many contexts. To confer the extraordinary protection of the participation clause on all the manifold activities that could be interpreted as threats could tend to encourage unreasonable and fractious demands by employees. Considering threats generally to be mere opposition will not inhibit employees with reasonable complaints from referring to the possibility of filing charges in informal discussions with their employers.

*Id.*

Without considering whether or not the fear of "unreasonable and fractious de-mands" is justified, this court believes that the rationale should apply only to cases, such as *EEOC v. Johnson Co.*, in which the "threat" is designed to coerce the employer into acquiescence in employee demands and is conditioned upon the employer's failure to submit to those demands. In other cases, such as the instant one, involving mere communication of a definite and unswerving intent to file a charge with the EEOC not conditioned upon future action by the employer, the reasoning is not appropriate. The point of the latter is to inform, not to coerce. Thus the statement is not made in order to advance any "unreasonable and fractious demands" or to gain undue leverage in bargaining with the employer. Moreover, it is not an ambiguous activity that may or may not be construed as a threat, protection of which would improperly enlarge the scope of the "participation" clause. Instead, it is a statement of an intention to engage in an activity that is protected by the very core of the "participation" clause, that is, making a charge. The court therefore concludes that *EEOC v. Johnson Co.* is distinguishable and that the "participation" clause should apply to the present case.[12]

In the alternative, the court believes that plaintiff's statement to Dean Granger is clearly protected by the "opposition" clause. That clause is often relied upon in cases in which application of the "participation" clause to the employee's conduct is considered dubious. *See, e. g., Hicks v. ABT Associates, Inc., supra*, 572 F.2d at 969; *EEOC v. Kallir, Philips, Ross, Inc., supra*, 401 F.Supp. at 71 n.12. Such reliance is possible because, in conceptual terms, "participation" is a subset of "opposition"; "participation" is primarily a specialized form of "opposition" that requires a connection with an "investigation, proceeding, or hearing" before the EEOC and receives

---

12. The EEOC takes the position that threats generally come within the protection of the participation clause. *See Schlei & Grossman* 430 n.43. Under the analysis proposed in note 11, *supra*, when an employee has an *actual present intention* of filing a charge but commu-nicates that intention to the employer in threatening language, protection under the participation clause should be defeated only if the employer's reaction was motivated only by the form rather than by the fact communicated.

more intensive protection than other opposition activities.

Not all alleged "opposition" activities are given immunity from retaliation, however. Two requirements not present in the context of the "participation" clause must be met under the "opposition" clause. First, the form of the "opposition" must not be unlawful, *Green v. McDonnell Douglas Corp.*, 463 F.2d 337 (8th Cir. 1972), nor excessively disloyal or hostile, or disruptive and damaging to the employer's business, *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 545 F.2d 222 (1st Cir. 1976). In the present case, the form of the opposition, plaintiff's stating to Dean Granger that he intended to file a charge with the EEOC, was reasonable, discreet, and not excessive. Therefore, the first requirement is satisfied.

The second requirement embodies the major difference between the "participation" and "opposition" clauses. Unlike the "participation" clause, under which the validity of the claim of employment discrimination that gave rise to the retaliation need not be established, the language of the "opposition" clause imposes a requirement that the practice opposed be an unlawful employment practice under Title VII.[13] No decision of the Court of Appeals for the Sixth Circuit has construed this language, but two interpretations of the precise meaning of the clause have emerged from other courts. Under one view, the employer must actually be guilty of the employment discrimination opposed for the employee to be protected. *See EEOC v. C & D Sportswear Corp.*, 398 F.Supp. 300 (M.D.Ga. 1975). Were the court to adopt this standard, plaintiff would be entitled to no protection under the "opposition" clause because of his failure to prove that defendants were practicing reverse discrimination. According to the other interpretation, the employee need only have a reasonable belief that the employer was engaged in the unlawful employment practice opposed. *See,*

*e. g., Sias v. City Demonstration Agency, supra,* 588 F.2d at 695; *EEOC v. Johnson Co., supra,* 18 FEP at 902; *Hearth v. Metropolitan Transit Commission, supra,* 436 F.Supp. at 688.

■ The court in *Hearth v. Metropolitan Transit Commission, supra,* cogently stated its reasons for adopting the "reasonable belief" standard:

[A]ppropriate informal opposition to perceived discrimination must not be chilled by the fear of retaliatory action in the event the alleged wrongdoing does not exist. It should not be necessary for an employee to resort immediately to the EEOC or similar State agencies in order to bring complaints of discrimination to the attention of the employer with some measure of protection. The resolution of such charges without governmental prodding should be encouraged.

The statutory language does not compel a contrary result. The elimination of discrimination in employment is the purpose behind Title VII and the statute is entitled to a liberal interpretation. When an employee reasonably believes that discrimination exists, opposition thereto is opposition to an employment practice made unlawful by Title VII even if the employee turns out to be mistaken as to the facts.

*Id.* at 688–689. This court finds that logic compelling and thus holds that the "opposition" clause requires only a reasonable belief on the employee's part that the employer is engaged in an unlawful employment practice.

■ It is clear from the record that under this view, plaintiff would be protected by the "opposition" clause. Undisputably plaintiff actually and in good faith believed that the differences in his, Colen's, and Allen's salaries resulted from reverse racial discrimination. Furthermore, the proof establishes that this belief was reasonable. Based on the information available to him, plaintiff believed that he and

---

**13.** "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has *op-*

*posed any practice made an unlawful employment practice by this subchapter ....*" 42 U.S.C. § 2000e–3 (emphasis added).

the other two faculty members were performing essentially the same jobs. He knew that none of them had prior teaching experience and that only he and Colen had doctorate degrees. Having learned of the amount of Allen's salary from the records at the Tennessee Higher Education Commission, he was certain that his salary was lower than Colen's or Allen's. At trial, defendants offered extensive evidence comparing the relative qualifications of the three faculty members in order to justify the differences in salaries. *See, e. g.,* Trial Transcript, at 147, 384, and 386. This information, however, was never communicated to plaintiff before he filed his complaint with the EEOC. *See* Trial Transcript, at 114, 230, and 233. Plaintiff had been present when other faculty members discussed what they perceived as the anomalousness of Colen's salary. *See* Trial Transcript, at 8–9. In addition, one faculty member, Mary Bloch, testified that she believed that Colen's higher salary was due to his race and sex; in 1976 she stated to Dean Granger her feeling that UTSSW generally paid blacks higher salaries than whites with comparable qualifications. *See* Trial Transcript, at 130. In light of all this evidence, the court concludes that plaintiff reasonably believed that he was a victim of reverse discrimination. Therefore, plaintiff's statement to Dean Granger was protected by the "opposition" clause.

Plaintiff has established all the elements of a prima facie showing that defendants discharged him in retaliation for his engaging in an activity protected by 42 U.S.C. § 2000e–3. The explanation offered by defendants to show that plaintiff was discharged for legitimate nondiscriminatory reasons has been found to be a mere pretext. Therefore, plaintiff has clearly established that defendants violated Title VII. The only remaining questions concern the measure and type of relief to which plaintiff is entitled for this violation.

**14.** At the time that plaintiff's attorney requested the EEOC to terminate its consideration of plaintiff's charge, the regulation was codified in 29 C.F.R. § 1601.9 (1975).

## C. REMEDY

Defendants have presented several arguments in an effort to persuade the court to deny all relief to plaintiff. First, they contend that because plaintiff's attorney agreed to withdraw the EEOC charge of unlawful retaliation in light of defendants' rescinding the nonretention decision, plaintiff is estopped from maintaining this suit. Plaintiff counters that charges filed with the EEOC can be withdrawn only with the consent of the EEOC, 29 C.F.R. § 1601.-10 (1978),[14] and therefore any such agreement between the parties is unenforceable as a matter of law. The cited regulation was promulgated, however, not for the benefit of individual discriminatees, but to preserve the EEOC's ability to protect the public interest by allowing it to file suit based upon a charge of discrimination even after the charging party has entered into a private settlement with the employer in which the employee's personal rights have been vindicated. *See, e. g., EEOC v. McLean Trucking Co.,* 525 F.2d 1007, 1010–11 (6th Cir. 1975); *EEOC v. Kimberly-Clark Corp.,* 511 F.2d 1352, 1361 (6th Cir. 1975). In spite of this regulation, an individual employee will be bound by the settlement agreement he has made. *See id. But see Voutsis v. Union Carbide Corp.,* 452 F.2d 889, 894 (2d Cir. 1971).[15] In this case, however, as discussed previously, the parties did not enter into a settlement agreement of any sort. Rescission of the nonretention decision and withdrawal of the EEOC retaliation complaint did not constitute a bargained-for exchange. Reinstatement of plaintiff was based solely upon Dr. Smith's conclusion that proper procedures had not been followed in reaching the nonretention decision. Therefore, no agreement exists to enforce. Moreover, although plaintiff's attorney did state that he would withdraw the charge, defendants offered no evidence that they

**15.** "We express no opinion, however, on the question whether appellant could, without the federal commission's consent, bind herself to a settlement after filing her federal complaint." *Voutsis v. Union Carbide Corp., supra.*

relied on this representation to their detriment. Thus there is no reason to estop plaintiff from pursuing his remedies under Title VII.

 Defendants next contend that plaintiff suffered no injury as a result of the Title VII violation because Dr. Smith rescinded the nonretention decision before it became effective, and the rescission rendered the retaliation claim moot. The court, however, has found that plaintiff suffered a loss of summer employment as a result of the nonretention decision.[16] Since that decision was made in violation of Title VII, it is clear that the loss of the summer teaching position resulted from that violation. The claim cannot, therefore, be moot. Furthermore, plaintiff has made a claim for an injunction requiring defendants to expunge his personnel records of any reference to the manner in which he has pursued his reverse discrimination complaint. Plaintiff thus has such a stake in the outcome of the controversy that the case could not be considered moot even without the existence of the claim for monetary relief.[17]

Defendants argue that plaintiff has suffered no injury for which he can obtain monetary relief in a Title VII action. The enforcement section of Title VII provides in pertinent part:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay . . . , or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g).[18] From the language of this statute, it is clear that equitable relief can be awarded to the successful Title VII claimant; recovery of damages is not specifically authorized, however.

 Plaintiff, who seeks various elements of damages including compensation for lost wages, humiliation, and emotional distress, contends that damage awards are not precluded by the statute. He argues that because the purpose of Title VII is to eliminate the inconvenience, unfairness, and humiliation of discrimination in employment, compensation for employees who have suffered such psychic injuries is appropriate. Several cases have stated that such is the purpose of Title VII. *See, e. g., Nesmith v. YMCA*, 397 F.2d 96 (4th Cir. 1968); *Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342 (5th Cir. 1968); *Green v.*

**16.** Plaintiff's proof on this issue has already been discussed. In addition to that proof, a plaintiff in an employment discrimination case is entitled to have resolved in his favor all doubts and ambiguities as to what he would have earned had he not been the victim of a Title VII violation. *See, e. g., Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976); *EEOC v. Detroit Edison Co., supra*, 515 F.2d at 315; *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1379 (5th Cir. 1974). Based upon all this, the court believes that plaintiff suffered the loss of the summer teaching position primarily as a consequence of defendant's retaliation.

**17.** The case is therefore unlike *Cramer v. Virginia Commonwealth University*, 486 F.Supp. 187 (E.D.Va.1980), in which the court dismissed as moot a case in which the plaintiff had dropped his monetary and reinstatement claims, was employed elsewhere at a higher salary than he could have received from defendant, and sought only a declaration that

defendant engaged in sex discrimination against males and an injunction prohibiting that practice. The court stated that there was no case or controversy because the only possible benefit to plaintiff from such relief would be a sense of personal satisfaction and thus he did not have a sufficient stake in the outcome of the litigation to assure concreteness and adverseness.

**18.** Concerning the requirement that the employer's violation of Title VII be "intentional," the courts have held that a finding that the violation was not accidental is sufficient. *See, e. g., Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); *Local 189, Paperworkers v. United States*, 416 F.2d 980 (5th Cir. 1969). *See also* note 3, *supra*. Specific intent to discriminate is not necessary; only intent to do the act that caused the discrimination is required. The court holds that such intent was present in this case.

*McDonnell Douglas Corp.*, 318 F.Supp. 846 (E.D.Mo.1970); *United States v. Medical Society*, 298 F.Supp. 145 (D.S.C.1969).[19] Compensatory damages for mental distress have actually been awarded in only one case, however. *See Humphrey v. Southwestern Portland Cement Co.*, 369 F.Supp. 832 (W.D.Tex.1973). In any event, plaintiff's claim for such relief must be denied because the Sixth Circuit has held that damages are not recoverable in Title VII cases. *Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192 (6th Cir. 1978) (compensatory damages); *EEOC v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975) (punitive damages).

▬ Plaintiff's request for compensation for the summer employment he lost as a result of the unlawful discrimination may be granted, however, in the form of an award of backpay. Backpay essentially consists of lost or unpaid wages or salary to which an employee, for whatever reason, is entitled. Whenever a court finds that an employer has violated Title VII, an award of backpay should generally be granted to the discriminatee. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In fact, such an award should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 298–99. Since defendants have suggested no reasons that would justify a denial of backpay under the *Albemarle* standard, and the court believes that no such reasons exist,[20] plaintiff is entitled to an award of backpay in the amount of the salary he would have received for teaching in the summer school program.

The fact that plaintiff made no specific prayer for relief in the form of backpay and persisted in characterizing his claim for compensation for the loss of the summer teaching position as a claim for damages instead of backpay, is of no consequence. A similar issue arose in *Albemarle Paper Co. v. Moody, supra.* The Court there held that such conduct by the plaintiff may constitute a proper reason for denying an award of backpay in a particular case if that conduct causes the employer to suffer actual and substantial prejudice. *Id.* at 424, 95 S.Ct. at 2374, 45 L.Ed.2d at 300. Plaintiffs in *Albemarle* had originally sought only injunctive relief and had assured the trial court that the case involved no claims for monetary relief; only after several years of discovery did plaintiffs move to add a prayer for backpay. While such a course of events may well substantially prejudice an employer's ability to defend against a claim for backpay, plaintiff's failure to assert a claim for backpay in the case at bar will not. Plaintiff has throughout this litigation sought compensation for the loss of the summer employment. No matter whether the claim is characterized as one for damages or for backpay, plaintiff's pleadings and conduct of his lawsuit have clearly placed defendants on notice that those lost wages would be at issue. The lack of such notice in *Albemarle* created the possibility of prejudice in that case; its presence removes that possibility in the instant case. Moreover, defendants did actually put on a defense against plaintiff's claim for the lost salary. The court does not believe that their defense would have been any different had plaintiff denominated his claim as one for backpay. Since no prejudice is possible or demonstrable in this case, the court holds that plaintiff is not barred from recovering backpay. Thus defendants' contention that plaintiff has suffered no compensable injury is without merit.

**19.** Not only were damages not granted in these cases, there was not even a discussion of whether or not damage awards should ever be made in Title VII cases in order to effectuate the Act's purpose.

**20.** As has been found by the court, unlawful discrimination was a causal factor in the nonre-

tention decision. See text accompanying note 4, *supra*. Therefore, plaintiff is "statutorily entitled" to recover the lost compensation. *See King v. Laborers International Union of North America, U.L. No. 818*, 443 F.2d 273, 279 (6th Cir. 1971).

■ Plaintiff is also seeking various types of injunctive relief against defendants. Pursuant to the enforcement section of Title VII, the court has the authority to enjoin unlawful employment practices that have been found to exist and order such other affirmative relief as may be appropriate. 42 U.S.C. § 2000e–5(g). Whether or not "other affirmative relief" is appropriate should be determined in light of the same considerations that guide decisions on the grant or denial of backpay. Thus, affirmative relief should be granted in this case if it will further the two major purposes of Title VII: to eliminate unlawful retaliation in the future against those who complain of employment discrimination and to make whole those particular persons who have been victims of unlawful retaliation.

■ Plaintiff first seeks an injunction requiring defendants to remove from his personnel files and all other records at the University and the UTSSW, and wherever otherwise located, all references to the manner in which he has pursued his employment discrimination claims. The court believes that this injunction should be granted and that eradication of all references to plaintiff's pay inequity and employment discrimination claims generally should be required. A similar expungement remedy was specifically approved in *Mead v. United States Fidelity & Guaranty Co.*, *supra*, 442 F.Supp. at 136. The court there stated that such relief is necessary "both to eliminate the discriminatory effects of past retaliation and to preclude any future discriminatory effects" on the discriminatee because of the past acts of retaliation. *Id.* This court believes that reasoning is applicable in the present case. Expungement of these records therefore serves the statutory objective of making the victim of retaliation whole.

■ Another injunction requested by plaintiff would require defendants to devel-op and disseminate a grievance procedure for employment discrimination claims within the University. The deficiencies of the present "system" were noted in an earlier discussion in this memorandum. The court believes, however, that the requested relief should be denied. Plaintiff has neither alleged nor proven that there is any constitutional or statutory basis for requiring defendants to develop such a procedure. Moreover, plaintiff has not established that the present "system" violates anyone's rights. The right to be free from unlawful employment discrimination is protected by the grievance mechanism established by Congress in Title VII and administered by the EEOC. Additional protection by an internal grievance system within the University would not seem necessary.

■ Finally, plaintiff seeks an order of this court enjoining defendants from retaliating against persons who file grievances, complaints, or EEOC charges, and requiring defendants to develop and disseminate a clear and direct policy forbidding such retaliation. The court has decided to deny this prayer because plaintiff's claim for such relief is moot.[21] Plaintiff is no longer employed by defendants and does not seek to regain his former employee status by having this court order his reinstatement. He is therefore not subject to the threat of retaliation of which he complains because these defendants are no longer able to interfere with plaintiff's right to make employment discrimination complaints. Such a situation obviates the need for an injunction against retaliation and renders the claim moot. *See, e. g., Caldwell v. Craighead*, 432 F.2d 213 (6th Cir. 1970); *Bransted v. Wolke*, 455 F.Supp. 489 (E.D.Wis.1978). Like the court in *Caldwell*, this court believes that "[a]t best, an extremely remote chance exists that [defendant's] . . . wrongful conduct will be repeated and directed at [plaintiff] to deny him his [rights]." *Caldwell v. Craighead*, 432 F.2d at 218. Such a

---

21. Mootness is an additional ground for denying the injunction requiring defendants to develop a grievance procedure. In cases in which a plaintiff seeks both injunctive relief and some form of monetary relief, the injunctive relief claims can be moot even though the claims for other remedies present live controversies. *See, e. g., Chase v. McMasters*, 573 F.2d 1011 (8th Cir. 1978); *Wycoff v. Brewer*, 572 F.2d 1260 (8th Cir. 1978).

remote chance is not enough to vivify plaintiff's claim for this relief. Furthermore, if the court were to grant this injunction, the order would not affect the parties' relative positions or change plaintiff's status for the better. *See, e. g., Caldwell v. Craighead, supra; Cramer v. Virginia Commonwealth University, supra,* 486 F.Supp. 187. It is apparent that granting such an order would in no way serve the statutory purpose of making the plaintiff whole.

Nor was this action brought or tried as a class action, a posture that could have saved this aspect of the case from mootness. *See Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Some courts, concluding that Title VII cases inherently involve discrimination against a class of employees, allow class-wide injunctive relief even when the lawsuit is not in the form of a class action. *See, e. g., Saracini v. Missouri Pacific Railroad,* 431 F.Supp. 389, 395 (E.D. Ark.1977). Such relief has not been granted, however, in a case in which the claim has become moot as to the only official plaintiff. Were it otherwise, numerous practical difficulties in enforcing the court's decree would arise. The relief plaintiff has requested is designed to compel defendants to comply with positive law, that is the portion of Title VII that prohibits retaliation against those who file charges with the EEOC or oppose unlawful employment discrimination. Such an injunction would have the sole practical benefit of entitling plaintiff to move the court to hold defendants in contempt for violating the injunction and impose sanctions therefor, instead of requiring an aggrieved party to file a new lawsuit and establish that defendants have violated the mandate of Title VII itself. Plaintiff, who now works in another state, will not be in a position to learn of any contumacious behavior in order to make such a motion, and since this is not a class action, none of defendants' employees would be able to step into plaintiff's shoes. The practical effect of the injunction plain-

tiff requests would therefore be a nullity and would not serve the other statutory goal of eradicating future unlawful retaliation. For these reasons, the court believes that plaintiff's request for this relief should be denied.

▪ Plaintiff also seeks an award of attorneys' fees. Title VII specifically enables the court to allow the prevailing party a reasonable attorney's fee. 42 U.S.C. § 2000e–5(k).[22] Although the grant of an attorney's fee award is within the discretion of the court, the power should ordinarily be exercised in favor of the prevailing plaintiff. *See Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 415, 95 S.Ct. at 2370, 45 L.Ed.2d at 295; *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). The court believes that plaintiff is entitled to such an award. Plaintiff has established that defendants engaged in an unlawful employment practice and has successfully obtained some, although not all, of the relief he requested. He is therefore a prevailing party within the meaning of the statute.

Since the court denied several of his prayers for relief, however, plaintiff actually only partially prevailed in this case; the court must thus confront the issue of what effect this partial victory has on the award of attorney's fees. There is a split of authority on this question, with some courts holding that the award "should be proportionate to the extent to which plaintiff prevailed," and others allowing the award to include even the time spent on the unsuccessful portions of the case. *See Schlei & Grossman* 1303, 1306. The Sixth Circuit has not yet spoken on this issue in a Title VII case but has adopted the latter, more liberal, position in the context of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *See Northcross v. Board of Education,* 611 F.2d 624 (6th Cir. 1979). The court there held that once it has been determined that the plaintiff is the prevailing party, he is

---

**22.** Because of this explicit statutory provision for attorneys' fees, the general rule against awards of such fees, as articulated by the United States Supreme Court in *Alyeska Pipeline* *Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), is inapplicable.

entitled to recover attorneys' fees for "all time reasonably spent on a matter." The fact that some of that time was spent in pursuing issues or research which was ultimately unproductive, rejected by the court, or mooted by intervening events is wholly irrelevant. So long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation, unless the positions asserted are frivolous or in bad faith." *Id.* at 636. This court believes that the same rule should apply in Title VII cases. The Fees Awards Act of 1976 is written in essentially the same language as the provision allowing attorneys' fees under Title VII. Moreover, Congress was clearly mindful of Title VII when it drafted the 1976 Act. *See S.Rep.No.94–1011*, 94th Cong., 2d Sess., *reprinted in* [1976] *U.S.Code Cong. & Ad.News* 5908. In light of this, it would be anomalous not to apply the *Northcross* rule in the present case. Plaintiff is therefore entitled to recover a reasonable attorney's fee for all time reasonably spent on this action. Since the exact amount of plaintiff's attorney's fee award cannot be calculated on the present record, the court will, upon proper application by plaintiff, hold an evidentiary hearing on the matter at a later date.[23]

Finally, plaintiff seeks compensation for the fee he paid his original attorney for representing him in his successful effort to have the nonretention decision rescinded.[24] Defendants contend that plaintiff cannot recover this amount because the attorney represented him only with respect to the claim that plaintiff had been nonretained in violation of the University handbook procedures and without regard to the Title VII claim. This assertion is easily countered by referring to the evidence. After Dr. Smith decided to rescind the earlier nonretention, plaintiff's attorney wrote the EEOC to inform them of this action. *See* Trial Exhibit

P–25. That letter reveals that the attorney had previously been in contact with the EEOC concerning plaintiff's retaliation claim, that he considered the meeting with Dr. Smith to be a private conciliation effort in conformity with Title VII, and that he intended to assist the EEOC with plaintiff's reverse discrimination claim, which all parties agreed was not to be affected by the rescission of the nonretention decision. Based upon this, the court believes that plaintiff's efforts to have the decision rescinded were intimately related with his Title VII claims so as to constitute one single dispute between the parties. When Dr. Smith rescinded the earlier decision, plaintiff became the "prevailing party" on that issue; under the *Northcross* "practical" interpretation of that term, plaintiff is entitled to these attorney's fees.

## II. THE FIRST AMENDMENT CLAIM

### A. FACTS

In the fall of 1976 an unfortunate incident occurred in Bradley County, Tennessee, in which a child, who had been under the supervision of the Tennessee Department of Human Services, died as the result of extreme child abuse. Prior to the occurrence employees of the local office of the department had allowed the child's parents to regain custody of the child in spite of their past history of child abuse. Defendant Horace Bass, then the commissioner of that department, responded to the incident by taking disciplinary action against employees in the local office.

Plaintiff, on November 4, 1976, wrote a letter to Commissioner Bass criticizing him for taking such action, indicating his opinion that Bass' response to the situation was "hasty and ill-advised" and that Bass lacked "sensitivity" to the needs of the department's employees. *See* Trial Exhibit P–

---

23. If defendants wish to contest any portion of the fee on grounds of frivolousness or bad faith, *see Northcross v. Board of Education, supra*, 611 F.2d at 636, they may do so at this hearing.

24. This fee was in the amount of $442.75. *See* Trial Exhibit P–51.

28.[25] This letter was written on plaintiff's personal stationery, which had the University seal and the words "from the desk of . . . Jim Croushorn" at the top. On November 8, a letter to the editor written by plaintiff and criticizing Bass was published in the *Nashville Banner*, a newspaper circulated throughout Middle Tennessee. The gist of the letter was that Bass was motivated by political considerations when he took the punitive actions against the Bradley County personnel. *See* Trial Exhibit P–29.[26] No intimation of plaintiff's connection with the University or the UTSSW appeared in the letter.

Bass was extremely upset about these letters, *see* Trial Transcript, at 202–03, 325; he called plaintiff on the evening of November 8 to demand a public retraction, but plaintiff refused to comply. The next day, Bass contacted defendant Dean Granger to inform him of the situation and to express his opinion that the letters were inflammatory and inaccurate. *See* Trial Transcript, at 326; Affidavit of Ben P. Granger at 1

(filed March 1, 1977); Trial Exhibit P–30. During the conversation, Bass requested that Granger take some action against plaintiff because of the letters. *See* Trial Exhibit P–52 (Deposition of Horace Bass, at 30–31); Affidavit of Ben P. Granger, *supra.* Bass also reminded Granger that the UTSSW depended upon and received grants of nearly one million dollars annually from the Department of Human Services. *See* Trial Transcript, at 109, 114.

Granger was deeply disturbed by Bass' reaction to the letters. *See* Trial Transcript, at 197. He feared that plaintiff's criticisms of Bass would adversely affect UTSSW's relationship with Bass' department. *See* Trial Exhibit P–38. He was particularly concerned that Bass thought the letter on stationery bearing the University seal reflected the position of the UTSSW on the Bradley County incident, and he endeavored to assure the Commissioner that this was not the case. *See* Trial Transcript, at 201. He asked Bass to for-

---

**25.** The text of the letter is as follows:

Commissioner Bass,

This is a request that you reconsider the actions you've taken against DHS staff in Bradley County; that you make your charges against staff to them in writing as to what state policy they failed to follow; and if documented evidence shows nothing but competent staff carrying out state policy, that you reinstate them and publicly apologize to them for your hasty and in-advised action. Horace, surely you had more sensitivity to people when you were a minister. What has happened to you?

Jim

**26.** The text of this letter is as follows:

By JIM CROUSHORN
2933 Anderson Road

Once again the Blanton administration has demonstrated its ineptness in administering state business by Commissioner Horace Bass' grandstanding in Bradley County and his abusive and utterly capricious treatment of Bradley County staff.

Melisha Gibson's death was tragic but there is no evidence that the Bradley County staff in any way failed to follow state policies. All evidence suggests that the workers involved were of above average competence. Commissioner Bass' indictment of competent employes that were carrying out state policy is not an indictment of these workers or the Bradley County office as much as it is an indictment of state policy and Commissioner

Bass, who is responsible for policy formulation.

Commissioner Bass' action is further evidence of the degree to which politics dominates the Department of Human Services (DHS) with its devastating effect on morale, effectiveness and efficiency. It is well known within the department that the DHS staff has been expendable for partisan political reasons. The fact that no charges have been made in writing against the Bradley County staff emphasizes that the rights and just treatment of DHS staff are easily put aside when it is politically expedient.

Commissioner Bass' action in Bradley County cannot be allowed to stand. It must be protested. I appeal to everyone reading this (especially DHS staff) to write Commissioner Bass (410 State Office Building, Nashville 37219), asking him to reevaluate the adverse actions; that he make his charges against the staff in writing as to what state policy they failed to follow; and if the evidence shows nothing but competent staff carrying out state policy, that he reinstate the staff and publicly apologize for his hasty and ill-advised actions. I also appeal to you to write the Bradley County staff a letter of your support during this time of abuse by the state office (Bradley County Department of Human Services, 485 Second St., S.E., Cleveland, Tenn., 38311).

ward the personal letter to him so that he could confer with legal counsel about whether plaintiff's use of such stationery was improper. *See* Trial Transcript, at 327. At trial Granger testified that during the conversation he indicated to Bass that he could do nothing about the letter to the editor. *See* Trial Transcript, at 199. With the exception of this assertion, however, the entire record evinces that Granger desired to assist Bass in retaliating against plaintiff for writing both letters. Without making any distinction between the two letters, and specifically mentioning only the letter to the editor, Granger stated in a note to Bass on November 10, "I will certainly do what I can with regard to this situation." *See* Trial Exhibit P–31.[27] Furthermore, even after Dr. Smith informed Granger that nothing legal could be done to plaintiff for writing the letter to the editor, Granger wrote in a memorandum to plaintiff's personnel file, "I plan to follow up on this in terms of what might be able to be done *either formally or informally.*" *See* Trial Exhibit P–30 (emphasis added).[28]

Subsequently, Bass sent to Granger a copy of plaintiff's letter of November 4 as well as a copy of a staff report concerning the events in Bradley County, and Granger referred these items to Dr. Smith. On November 17, Dr. Smith forwarded the information to legal counsel for the University requesting his assessment of the situation. *See* Trial Exhibit P–36. At the same time Granger sent a copy of this letter to Dr. Fauri, who had replaced Dr. Bonovich as branch director of the UTSSW in Nashville. *See* Trial Exhibit P–34.[29] Meanwhile, Bass

27. The full letter reads as follows:

November 10, 1976

Commissioner Horace Bass
Department of Human Services
410 State Office Building
Nashville, Tennessee 37219

Dear Commissioner:

I appreciate your phone call on Tuesday, November 9th concerning the editorial letter by Jim Croushorn. I share your deep concern about this kind of letter, the inaccuracies, and the inflammatory nature of it. While he was not representing our School or the University in any form or shape I will certainly do what I can with regard to this situation. I would hope that there could be some legal recourse that you and the Department could take based upon the inaccuracies of the letter.

I will plan to be in touch with you about what might be done about this, and likewise I would appreciate suggestions as to what I may be able to do to indicate to the public the effectiveness of your department.

Thank you for your cooperation.

Sincerely yours,
Ben P. Granger, Ph.D.
Dean, School of Social Work

BPG:sam

28. The memo states in full:

*MEMO*

TO: Folder of Jim Croushorn
FROM: Ben P. Granger
DATE: November 10, 1976

Commissioner Horace Bass phone [sic] me on Tuesday, November 9 expressing his concern about the editorial in the Nashville Banner, dated November 9, 1976, by Jim Croushorn. Commissioner Bass is aware that Mr. Croushorn is a faculty member with the University and the School of Social Work. He *was particularly brought to this awareness* last year when Mr. Croushorn made inaccurate remarks with regard to what the State (Department of Human Services, Personnel Office) were doing in developing a merit system. On that occasion it was felt that he twisted material to his own purposes and irritated the whole situation in terms of misinterpretation and alienating persons from working cooperatively together.

Commissioner Bass stated that he was extremely distressed by the editorial by Mr. Croushorn, and felt it was inflammatory, inaccurate, and further twisting of the facts or lack of facts. He felt that Mr. Croushorn was drawing inappropriate conclusions, lacked important information to arrive at such conclusions, and was suggesting or recommending that staff within the Department take adverse action.

I shared the editorial with Dr. Smith, Vice-Chancellor for Graduate Studies and Research, and he will determine whether or not any type of action can be taken. It was his opinion that since Mr. Croushorn stated this as an individual, without indicating his attachment to the School of Social Work or the University, that there was nothing legal that we could do.

I plan to follow up on this in terms of what might be able to be done either formally or informally.

BPG:sam

29. The letter was accompanied by the following memo:

TO: David Fauri
FROM: Ben P. Granger

wrote a letter to plaintiff in which he labeled the letter to the editor "assanine," stated that plaintiff had "little regard for fairness," and questioned his professional integrity. *See* Trial Exhibit P–33.[30] Granger received a copy of this letter from Bass and placed it in plaintiff's file. Plaintiff responded to Bass' letter with another note in which he expressed his surprise at the Commissioner's reaction and stated that public officials are properly subject to public criticism. *See* Trial Exhibit P–34.[31] Granger received a copy of this letter from Bass and placed it in plaintiff's file. He also sent a copy to Dr. Smith and Dr. Evans

Roth, who had been appointed to succeed Dr. Smith as Vice-Chancellor for Graduate Studies and Research. *See* Trial Exhibit P–38.[32] Finally, on December 15, 1976, the University's attorney informed Granger that plaintiff's use of the previously-described stationery could not be restricted. *See* Trial Exhibit P–40. Granger sent a copy of this memorandum to Bass. In spite of the legal advice he had received, however, Granger stated in an accompanying letter to the Commissioner, "While we *apparently* cannot take action in this matter please be assured that I am staying very close to the situation." *See* Trial Exhibit

---

DATE: November 17, 1976

I am enclosing for your information a copy of the letter that Jim Croushorn sent to Commissioner Bass. I have provided a copy of this letter to Dr. Smith and he will be clearing with the legal council [sic] as to what might be done about it. I will keep you posted.

BPG:sam

Granger's reasons for sending the letter to Dr. Fauri have not been adequately explained. The court believes that in all likelihood, Granger hoped that this would prompt Fauri to give plaintiff an unsatisfactory rating in his annual evaluation and thereby form the basis of a recommendation of non-retention.

A note at the bottom of the memo indicates that Fauri did place the information in plaintiff's "faculty folder."

**30.** The following is the text of the letter:

11/11/76

Jim Croushorn—

I was just looking over your note and noticed the last paragraph concerning sensitivity to people. Coming from someone who has no more regard for the truth than you and who would tell me that you did not feel you owed me an apology for your very assanine [sic] letter to the Banner, your words about sensitivity are indeed hollow.

I was with the District Attorney in Cleveland yesterday and he was telling me that I had exercised too much restraint in my discipline. You will someday see what I am talking about, but my bets are that even then you will not believe it.

I wonder what kind of "professor" you are having as little regard for fairness as you do? Given your bias as you said for workers against the bureaucracy I wonder how you stack up in the student-professor diachotomy [sic]! You being a "professor" I don't have to guess.

Horace Bass

**31.** The following is the text of plaintiff's letter:

14 Nov. 76

Horace,

I understand you referred to my letter to the editor in your talk to the Tennessee Conference on Social Welfare and I have also received your note. I'm a little surprised to [sic] the *amount* of your reaction to one person's exercising his 1st amendment rights (me writing a letter to the editor)!

Horace you are a public official, a politically appointed public official. You are subject to open and uninhibited criticism by the public. It comes with the turf of the position you occupy.

Jim

This letter was written on the same stationery as the letter of November 4, 1976.

**32.** The memo accompanying the copy of the letter reads as follows:

MEMO

TO: Hilton Smith
 Evans Roth

FROM: Ben P. Granger

DATE: December 3, 1976

RE: Correspondence between Mr. Croushorn and Commissioner Bass

This is the second letter that Commissioner Bass has received from Jim Croushorn during the past week or two. I provided you with the initial letter and requested that this be reviewed by the legal staff to determine whether or not Mr. Croushorn should be utilizing the University of Tennessee, Knoxville seal. This is his own stationery; however, I do have some reservations in his private correspondence being connected to the University of Tennessee, Knoxville. This certainly does not assist our public relations and professional relationships with the Department of Human Services.

I would appreciate your advice on this matter.

BPG:bp
Attachment

P–42 (emphasis added).[33] After sending this memorandum and letter, Granger received no further correspondence from Bass concerning this matter. See Trial Transcript, at 212.

From all the evidence it is clear that Commissioner Bass wanted Dean Granger to take some punitive action against plaintiff, although he did not specify what form the punishment should take. Furthermore, it is also clear that Granger was willing to accommodate Bass, partially from fear that plaintiff's letters might otherwise jeopardize the significant financial relationship between his school and the Department of Human Services. During most of November and early December, Granger actively considered possible ways to achieve his and Bass' mutual goal. On at least three occasions during this period he assured Bass that he would take whatever action he could.

Meanwhile, Granger was placing copies of all these letters and memoranda in plaintiff's file. Granger testified that this action was in conformity with his policy of placing all such materials concerning faculty members in their respective personnel files and that it was not done for the purpose of punishing plaintiff for criticizing the Commissioner. See Trial Transcript, at 207–08.[34] The court finds, however, that these materials would not have been produced much less placed in plaintiff's files had plaintiff not publicly criticized Bass. Although plaintiff was aware that Commissioner Bass was displeased with his letters, see Trial Exhibit P–34, he was unaware of the machinations carried on by defendants in their attempt to retaliate against him: he knew neither of the existence of the correspondence and memoranda nor of the placement of that material in his file. On December 17, 1976, in response to interrogatories propounded to defendants in plaintiff's employment discrimination lawsuit, plaintiff's attorney received copies of all materials contained in any files maintained by the University concerning plaintiff. It was at this point that plaintiff learned that his personnel files contained the correspondence and memoranda generated by defendants in connection with his criticism of Bass. See Trial Transcript, at 99; Affidavit of George C. Paine II (filed March 17, 1977). Shortly thereafter, plaintiff instituted this action claiming that defendants, by engaging in this clearly-documented behavior, had violated his first amendment rights.

Apparently unconnected with the activities of defendants Granger and Bass, Dr. Fauri called a meeting of the tenured faculty of the Nashville branch of the UTSSW on December 8, 1976, to discuss whether or not certain untenured faculty members would be retained the following academic year. See Trial Transcript, at 483–84; Trial Exhibit D–37. Plaintiff was among those under consideration. At the outset of the discussion of plaintiff, Dr. Fauri advised those present that plaintiff's letters about Bass were not relevant to plaintiff's retention or nonretention. See Trial Transcript, at 95, 423, and 484.

During the conversation, numerous legitimate criticisms of plaintiff's professional abilities and performance were voiced by the tenured faculty members. Many stated that plaintiff's failure to produce any scholarly writing or publications during his three years at the UTSSW was a substantial deficiency, especially because he had been re-

---

**33.** The letter states:

> December 28, 1976
> Honorable Horace Bass, Commissioner
> Tennessee Department of Human Services
> 410 State Office Building
> Nashville, Tennessee 37219
> Dear Commissioner Bass;
> I am enclosing a copy of a memo from Mr. Leadbetter, Staff Attorney for the University of Tennessee. While we apparently cannot take action in this matter please be assured that I am staying very close to the situation.

> If I can be of particular assistance in this or other matters please feel free to contact me.
> Thank you for your cooperation, and best wishes for the Christmas season and New Year.
> Cordially,
> Ben P. Granger, Ph.D.
> Dean, School of Social Work

**34.** Plaintiff put on no proof to contradict this assertion that Granger's acts were committed pursuant to this neutral policy.

quired to do no scholarly research or writing for his doctorate. Some questioned his ability to conceptualize and plan some of his courses in a manner appropriate to a professional social work graduate program. Plaintiff had discussed his previous retention troubles in his classes to such an extent that his students worried that his animosity toward the University would affect his grading; as a result plaintiff gave unusually high grades in those classes to alleviate those fears. The tenured faculty viewed this as a prime example of plaintiff's lack of good judgment. Many believed that he was insensitive to his colleagues, manifested by his conduct during meetings when he often attempted to control the proceedings through loud and incessant talking and insistence upon directing attention exclusively to matters of concern to him. The tenured faculty felt that plaintiff's resistance and resentment of constructive criticism offered by his peers created a severe limitation on plaintiff's potential for professional growth. They also believed that plaintiff directed his energy toward endeavors that had little professional value. The consensus of opinion that emerged from the discussion was that plaintiff's classroom work and scholarly efforts were too weak to compensate for his other faults, which otherwise might be tolerable. *See* Trial Exhibit D–38. At the close of the discussion, the tenured faculty members unanimously recommended that plaintiff not be retained. *See* Trial Transcript, at 95–96. Ironically, this body, which had helped plaintiff appeal the 1975 nonretention decision, concluded solely on the basis of his teaching and academic performance for three years that plaintiff should be terminated.

Based upon the evaluation of the tenured faculty, Dr. Fauri recommended to Dean Granger that plaintiff not be retained, and Granger concurred in this judgment. *See*

Trial Exhibit D–38. The court finds that the tenured faculty made its recommendation without regard to plaintiff's letters and that the same conclusion would have been reached even if plaintiff had not written those letters. Since the ultimate nonretention decision relied entirely upon the tenured faculty's recommendation, it, too, was completely unconnected with the letters. *See* Trial Transcript, at 352. Plaintiff appealed the nonretention decision through the University administrative structure to the Board of Trustees, but the decision was affirmed at each level of review. About the same time, plaintiff amended his complaint in this action to allege that his nonretention resulted from his criticism of Bass in violation of his first amendment rights.

Following his termination, plaintiff sought other employment and contacted in excess of one hundred prospective employers.[35] *See* Trial Transcript, at 49. Plaintiff refused to permit these employers to view his personnel files at the University because he knew that the Bass-Granger correspondence and related memoranda contained in those files included many derogatory comments about his character. This refusal itself, however, killed several job possibilities. *See* Trial Transcript, at 50. Plaintiff did eventually procure employment with the State of Florida. His experience with the University, however, has had a lasting effect on plaintiff: he testified at trial that as long as he is employed in government service he will not publicly or privately criticize government officials or their opinions. *See* Trial Transcript, at 48. Moreover, plaintiff intends to pursue a career in state government and plans to compete for higher level positions, and he reasonably fears that the derogatory materials in his University files will interfere with these career plans.[36] *See* Trial Transcript, at 50.

**35.** Although plaintiff testified that he was unemployed for approximately six months, *see* Trial Transcript, at 49, he offered no proof that he suffered any monetary loss during this period causally connected with defendant's acts.

**36.** Whether or not an employee should complain about letters in his personnel files that he

personally authored, such as the letters to Bass and to the newspaper, any reasonable employee would object to the presence of writings by high state officials impugning the employee's sense of fairness, honesty, and truthfulness. *See* Trial Transcript, at 549–50. Any materials

## B. VIOLATION OF § 1983

 Plaintiff contends that defendants' behavior infringed upon his first amendment rights in violation of 42 U.S.C. § 1983.[37] He also asserts that these facts establish the existence of a conspiracy to deprive him of his rights and thus give rise to causes of action pursuant to 42 U.S.C. §§ 1985(3) [38] and 1986.[39] At the outset, the court would note that since defendants' activities were in no way attributable to a racial or other class-based "invidiously discriminatory animus," the alleged conspiracy cannot be actionable under either § 1985(3) or § 1986. *See, e. g., Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

 To establish defendants' liability under 42 U.S.C. § 1983, plaintiff must prove two essential elements: (1) that defendants acted under color of state law and (2) that he suffered a deprivation of a constitutional right as a result of that action. *See, e. g., Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Orr v. Trinter*, 444 F.2d 128 (6th Cir. 1971). Plaintiff need not prove that defendants had the specific intent to deprive him of his first amendment rights, but only that they intended to commit the act that resulted in the constitutional deprivation. *See, e. g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Ingraham v. Wright*, 498 F.2d 248 (5th Cir. 1974); *Allison v. Wilson*, 434 F.2d 646 (9th Cir. 1970); *Jenkins v. Averett*, 424 F.2d 1228 (4th Cir. 1970); *Aldridge v. Mullins*, 377 F.Supp. 850 (M.D.Tenn.1972). None of the defendants contest the fact that they were acting under "color of state law" with regard to the facts of this case. The only question is whether or not defendants' actions deprived plaintiff of a constitutional right.

### 1. *Termination of Employment*

 Plaintiff first contends that defendants Granger and the University decided not to retain him on the faculty, and defendant Bass caused them to make this decision, because of his criticism of the commissioner. This plaintiff believes to have violated his first amendment rights. As an

---

contained in personnel files have an aura of factualness and relevance to an employee's job performance. Years after their placement in the files, such writings per se command an even greater respect because the authors may not be available or may not adequately remember the events so that the employee can effectively challenge their accuracy. Therefore, these materials pose a very real threat to plaintiff's career.

**37.** That statute provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

**38.** That statute provides in pertinent part:
(3) If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; ... in any case

of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
42 U.S.C. § 1985(3).

**39.** That statute provides in pertinent part:
Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representative, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ....
42 U.S.C. § 1986. As is readily apparent from the opening language, the remedy provided by this section is dependent upon a violation of § 1985.

untenured faculty member plaintiff had no right to continued employment with the UTSSW, and so there could be no violation of his constitutional rights unless his termination was based on an impermissible reason. It is well-settled, however, that a government employer cannot terminate an employee on a basis that infringes upon his first amendment right to free speech. *See, e. g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The reason for this rule is obvious:

> [I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." . . . Such interference with constitutional rights is impermissible.

*Id.* at 597, 92 S.Ct. at 2697, 33 L.Ed.2d at 577. Of course, it is true that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). Under certain circumstances the state can therefore impose more restrictions on its employees' speech than it can on that of the public at large. Defendants have made no allegations nor offered any proof that any such circumstances were implicated by plaintiff's speech, however. The criticisms of Bass did not affect plaintiff's classroom performance; they did not impede or disrupt the operation of the UTSSW or the University; they had no effect on discipline or coworker harmony. *See, e. g., id.; Hickman v. Valley Local School District Board of Education,* 619 F.2d 606 at 609 (6th Cir., 1980); *Aumiller v. University of Delaware,* 434 F.Supp. 1273, 1292–93 (D.Del.1977). No one but Commissioner Bass experienced confusion about whether plaintiff's opinion represented the official position of the UTSSW be-

cause the letter to the editor did not reveal plaintiff's connection with the UTSSW and Bass was the only recipient of the letter bearing the University seal; Granger promptly corrected Bass' mistaken impression. *See Yiamouyiannis v. Chemical Abstracts Service,* 521 F.2d 1392 (6th Cir. 1975). Plaintiff's criticism of Bass therefore falls outside the zone within which the state may legitimately regulate its employees' speech. Furthermore, since defendants did not prove that the letters contained "false statements knowingly or recklessly made by" plaintiff, *Pickering v. Board of Education, supra,* 391 U.S. at 574, 88 S.Ct. at 1738, 20 L.Ed.2d at 821, plaintiff's speech was protected by the first amendment.[40]

■ Plaintiff's claim fails to clear a different set of hurdles, however. In *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a case in which a public school teacher claimed that the termination of his employment resulted from his exercise of his first amendment rights, the Supreme Court stated:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484. In the present case, plaintiff was unable to prove that his criticism of Bass was a "substantial" or "motivating" factor in the decision to terminate his employment, and thus he failed to establish even a prima facie case. Granger's decision was made in reliance upon the recommen-

---

**40.** The first amendment protects the private letter to Commissioner Bass as well as the public letter to the editor. *See Givhan v. West-*

*ern Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

dation of Dr. Fauri, which was based upon the recommendation of the tenured faculty. Plaintiff proffered no evidence that would tend to prove that the tenured faculty's assessment of plaintiff was in any way affected by the letters concerning Bass. Moreover, the court has found that defendants have borne their burden of proving that they would have reached the same decision about nonretention even in the absence of the protected conduct. The reasons cited by the tenured faculty in support of its recommendation of nonretention were integrally related to plaintiff's merits as a teacher and were totally independent of his exercise of his first amendment rights. None of the reasons on their face can be said to have been "closely linked with, and colored by," anyone's disapproval of or displeasure with plaintiff's protected activities. *See Hickman v. Valley Local School District Board of Education, supra,* at 609. Stated differently, plaintiff would have been terminated because of the serious reservations held by tenured faculty members about his professional abilities even if he had never written the letters. Since plaintiff's nonretention was not caused by his exercise of his first amendment rights, his claim on this ground must fail.[41]

### 2. Tainting the Personnel Files

Plaintiff also claims that defendants have violated his first amendment rights by placing and maintaining the Bass-Granger correspondence and related memoranda in his personnel files. He contends that the presence of this derogatory material in his employment records jeopardizes his chances of obtaining future employment either as the result of his allowing prospective employers to view his files or his refusal to give such consent.[42] Plaintiff argues that this has the effect of punishing him for exercising his constitutionally-protected right of free speech, thereby infringing that right. He further claims that this has a present inhibiting or "chilling" effect upon his first amendment rights because he fears that in speaking freely he risks the imposition of a similar, subtle but very real, punishment.

■ Defendants, relying upon *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), contend that the insertion of these materials in plaintiff's personnel files has not caused plaintiff to suffer any injury in fact, because the alleged infringement of his constitutional rights is too speculative and "subjective." Defendants' reliance is misplaced. The Court in *Laird* was concerned only with issues of standing and justiciability. Plaintiffs in *Laird,* complaining about domestic surveillance and intelligence-gathering activities engaged in by the Army, alleged that they feared that the information collected by the Army might somehow be misused in the future, but they could not demonstrate that the information was being misused at the time. They also conceded that the defendants' activities had no real chilling effect upon them individually. Based upon this, the Court held that no case or controversy was presented and that plaintiffs lacked standing to sue. The

**41.** One court has stated that the ruling in *Mt. Healthy* limits only the scope of relief to which a plaintiff is entitled who has shown that his protected conduct has a substantial or motivating factor in his termination. In *Aumiller v. University of Delaware, supra,* 434 F.Supp. at 1303, the court stated that if a defendant proves that the plaintiff would have been terminated even if he had not exercised his first amendment rights, the court will be precluded only from awarding the remedy of reinstatement. This appears to leave open the possibility that such a plaintiff would be able to obtain some other form of relief, such as damages, simply for the invasion of his constitutional rights. Although it is not necessary to reach this issue since plaintiff in the instant case failed even to prove a prima facie case, the

court would comment that if a plaintiff's termination was not caused by his exercise of his first amendment rights, a finding necessary for a defendant to prevail under *Mt. Healthy,* then there has been no injury caused by the alleged invasion of rights, and the defendant should not be held accountable therefor. *See Carey v. Piphus,* 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252, 262–63 (1978).

**42.** Were he seeking a job that necessitated a security check or clearance, plaintiff would have no choice but to permit inspection of these files. Dean Granger acknowledged that the files would be available in such a case. *See* Trial Transcript, at 359.

Court ruled that in order for a person to challenge government action, "he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of the action ...." *Id.* 408 U.S. at 13, 92 S.Ct. at 2325, 33 L.Ed.2d at 163. In defining the term "direct injury," the Court stated that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm ...." *Id.* at 13–14, 92 S.Ct. at 2325–2326, 33 L.Ed.2d at 163–64. Since the plaintiffs could not show any reason that the information gathered by the Army would ever be released to anyone for any purpose there was no threat of specific future harm presented. In striking contrast, plaintiff in the instant case has alleged and proven that he has suffered and continues to suffer specific present harm and is under a threat of specific future harm. According to his testimony, plaintiff expects to change jobs during his career, and the materials in his files may well have an adverse effect on his job opportunities. Although the court does not know when plaintiff will choose to change employment, the court is certain that when he does so an extremely high probability exists that the prospective employer will request access to the personnel files. When that occurs, plaintiff will be presented with a veritable Hobson's choice of whether to grant or refuse such access. One who sees the files will naturally question plaintiff's veracity after reading statements made by his former employer and others charging that letters written by plaintiff contained inaccuracies and distortions of the truth. On the other hand, a prospective employer whose request to see the files is refused by plaintiff is also likely to view plaintiff in an unfavorable light. Either way, plaintiff runs a substantial risk of losing the job possibility solely because of the materials that defendants placed in his files. The legitimacy of this fear has already been demonstrated by plaintiff's difficulties in locating employment after his termination by the University. This constitutes a very real threat of specific future harm. Moreover, unlike the plaintiffs in

*Laird* who were not personally deterred from exercising their rights by the actions of the Army, plaintiff's knowledge that defendants actively sought to punish him and did in effect punish him because of their displeasure with his criticism of Commissioner Bass has compelled him to decide that in order to avoid any future harm of this nature he must refrain from expressing opinions that are contrary to those held by state officials. In this respect, plaintiff's first amendment rights have not simply been chilled; they have been frozen. Plaintiff is therefore experiencing specific present harm. In light of all this, plaintiff's claims cannot be characterized as "speculative" or "subjective"; the holding of *Laird* is thus not applicable to this case.

The court concludes not only that plaintiff has a justiciable claim, but also that he has established a violation of his first amendment rights. Unlike plaintiff's non-retention at the UTSSW, the harm described above unquestionably resulted from his criticism of Bass, speech that the court has already held protected by the first amendment under *Pickering.* Although Dean Granger asserted that the materials were placed in the files in accordance with his policy for handling all such faculty-related matters, it is clear beyond cavil that these particular papers would never have been produced, must less inserted in the files, had not plaintiff engaged in protected conduct. Granger's action was thus caused by plaintiff's speech, and the harm thereby created directly infringes upon plaintiff's right to engage in such speech. Plaintiff did not prove that Granger specifically intended to deprive him of this right by placing the materials into the file, but as was noted earlier, it is sufficient that plaintiff proved that Granger did intend to preserve these materials in plaintiff's files. Plaintiff has thus established a cause of action under 42 U.S.C. § 1983.

Plaintiff has maintained throughout this litigation that many of the statements made in the Bass-Granger correspondence and related memoranda are false, but the court believes, without specifically finding,

that the evidence on this point is inconclusive. Apparently if plaintiff were claiming that inclusion of these materials without affording him an opportunity to rebut the charges contained therein violated a property or liberty interest protected by the due process clause, failure to prove the falsity of the statements would be fatal to his case. *See, e. g., Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Ledford v. DeLancey*, 612 F.2d 883 (4th Cir. 1980). Plaintiff's claim is not so based. Furthermore, the court believes that due process is not the only constitutional ground upon which one may predicate a claim seeking expunction of material contained in a personnel file. Under the first amendment, it is not the lack of a hearing at which one could contest false charges or even the presence of *false* statements in one's personnel files that is relevant; it is the insertion of statements, either true or false, concerning an employee's exercise of his right of free speech that matters. When, as here, the potential or naturally expected use of those files will likely have the effect of penalizing the employee for engaging in such protected activity, the first amendment, not the due process clause, forms the basis of the complaint. As the court has already concluded, plaintiff has proven a violation of his first amendment rights and is entitled to a remedy under 42 U.S.C. § 1983.

## C. DEFENSES

■■■ Before determining what relief is appropriate in this case, the court must examine several preliminary issues bearing on defendants' liabilities. First, although not raised by the parties, the court must consider sua sponte whether defendant University is entitled to immunity under the eleventh amendment. *See, e. g., Alabama v. Pugh*, 438 U.S. 781, 782 n.1, 98 S.Ct. 3057, 3058 n.1, 57 L.Ed.2d 1114, 1116 (1978); *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662, 681 (1974). Unlike actions under title VII, which may be brought against a state, *Fitzpatrick v.*

*Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), suits brought pursuant to 42 U.S.C. § 1983 may not. *See, e. g., Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh, supra*. The question, therefore, is whether the University of Tennessee is a state instrumentality that is afforded protection by the eleventh amendment. In *Soni v. Board of Trustees*, 513 F.2d 347 (6th Cir. 1975), the Sixth Circuit held that even if the University of Tennessee were a state agency that would normally be entitled to eleventh amendment immunity, the state had waived that immunity by consenting to suits against the University. That court expressly reserved decision on whether the University would have been entitled to immunity in the absence of that waiver; the court was reluctant to resolve this issue because it felt that Tennessee law did not compel a conclusion either way and because the record did not contain sufficient data on the University's financial relationship with the state. *Id.* at 352. In response to that decision, the Tennessee legislature enacted a statute to dispel any notion that the state had intended to consent to suits against the University.[43] In light of that enactment, and based upon the "current weight of authority," one district court recently held that the University may not be sued because of eleventh amendment immunity. *Gross v. University of Tennessee*, 448 F.Supp. 245 (W.D.Tenn.1978), *aff'd on other grounds*, 620 F.2d 109 (6th Cir., 1980). Because that court did not examine the financial relationship referred to in *Soni* or otherwise analyze the issue of the University's status vis-a-vis the state, this court does not find *Gross* to be dispositive in the present case. At the same time, the record before the court does not provide any basis on which to justify a decision one way or the other. Therefore, rather than rule on this very important question on such an inadequate record, the court has found another ground, also unmentioned by the parties, on

---

**43.** Tennessee Code Annotated section 20–1702 provides in pertinent part: "No statutory or other provision authorizing the University of

Tennessee and its board of trustees to sue and be sued shall constitute a waiver of sovereign immunity."

which to dismiss the action against the University. Plaintiff has failed to prove by a preponderance of the evidence that the University, or its board of trustees, took part in any of the actions that resulted in plaintiff's injury; nor did they "cause" plaintiff to be subjected to the deprivation of his rights. Moreover, liability cannot be imposed on the University or its board simply on the basis of respondeat superior. *See, e. g., Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570, 580 (6th Cir. 1979). *See generally Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus plaintiff's action against the University must be dismissed.

█ The second issue is whether defendant Granger can be held liable for the deprivation of plaintiff's first amendment rights. There can be no question that he intentionally committed the act that has infringed upon plaintiff's rights: he placed the derogatory correspondence and memoranda into plaintiff's personnel files. As has already been noted, liability can be imposed on Granger on that basis, even if he lacked the specific intent to violate plaintiff's first amendment rights when he did the act. *See, e. g., Monroe v. Pape, supra.* Therefore, Granger is liable, in both his official and individual capacities, for injunctive relief. *See, e. g., Edelman v. Jordan, supra,* 415 U.S. at 663–64, 94 S.Ct. at 1355–56, 39 L.Ed.2d at 673; *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Insofar as plaintiff may be entitled to monetary relief, the situation is somewhat different. Because of the court's uncertainty with regard to the University's eleventh amendment immunity, it would be inadvisable to hold Granger liable for damages in

his official capacity. *See, e. g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In his individual capacity, however, Granger may clearly be adjudged liable for such relief. He has not raised the defense of good faith official immunity, and that failure precludes him from receiving the benefit of that doctrine. *See Gomez v. Toledo, supra; Jones v. Perrigan,* 459 F.2d 81 (6th Cir. 1972).[44] Therefore, defendant Granger is clearly accountable for the violation of plaintiff's constitutional rights.

Third, the court must determine whether defendant Bass can be held liable for the infringement of plaintiff's rights caused by the action of Granger in placing the objectionable materials in the files. Bass did not personally insert the materials, and so he did not personally "subject" plaintiff to a deprivation of his rights. He did not force, command, direct, or request Granger to place the letters and memoranda in the files, and thus he did not "cause" plaintiff to be "subjected" to the deprivation in any recognizable sense of the word "cause." In fact, the record is barren of any hint that Bass was even aware that Granger was so filing the materials. On the other hand, Bass did create the environment in which this particular violation of plaintiff's rights occurred, by calling Granger to request that some action be taken against plaintiff and by forwarding copies of his and plaintiff's letters to the dean. Without a doubt, Bass was the motivating force behind this series of events; plaintiff's rights would not have been infringed had Bass not engaged in these activities. The court, however, does not believe this to be a sufficient basis upon which to impose liability under § 1983.

---

**44.** The qualified good faith immunity defense would not be due Granger in any event. Although the court does not find that Granger acted maliciously to deprive plaintiff of his rights by placing this information in the personnel folder, the court does believe that Granger should have known that the infringement would result from his action. Granger's testimony evidences his knowledge that plaintiff's letter-writing was protected by the first amendment. Granger was also aware that the personnel files would be accessible to government agents who in the future might perform a se-

curity check on plaintiff. As an employer and administrator, Granger is chargeable with knowledge that personnel files generally are open to prospective employers who obtain the permission of the job applicant. On the basis of this evidence, the court concludes that Granger should have known that insertion of derogatory statements in plaintiff's files would have a strong tendency to injure plaintiff in the future. He also should have recognized that this injury would be connected with plaintiff's first amendment rights.

It is true, of course, that plaintiff has asserted and the court has found that defendants Bass and Granger conspired to punish plaintiff for criticizing Bass.[45] The absence of any class-based invidiously discriminatory animus prevents the conspiracy from being actionable under § 1985, but the doctrine of civil conspiracy may be used in a § 1983 case to extend liability for a deprivation of constitutional rights to persons other than the actual wrongdoer. *See, e. g., Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 576 (7th Cir. 1975); *Mizell v. North Broward Hospital District*, 427 F.2d 468, 472 (5th Cir. 1970); *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956); *Jones v. Bales*, 58 F.R.D. 453, 458 (N.D.Ga.1972); W. Prosser, *The Law of Torts* § 46 at 292–93 (4th ed. 1971). In such a case, the conspiracy standing alone does not give rise to liability; rather it is the injury to the plaintiff caused by specific overt acts that is actionable. "The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible for any overt act or acts." *Rutkin v. Reinfeld, supra.* Since the mere agreement to do a wrongful act is not remediable under § 1983, Bass can be held liable only if Granger violated plaintiff's constitutional rights by committing acts "in *pursuance* of the agreement." W. Prosser, *The Law of Torts, supra.* Had defendants agreed to place derogatory materials in plaintiff's personnel files, clearly Granger's act in doing so would have been in pursuance of the agreement. Likewise, if Granger had placed these materials in the files with the specific intent to punish plaintiff for criti-

cizing Bass, certainly such act would have been in pursuance of defendants' actual agreement to punish plaintiff. Since, however, Granger did not have that intent and his act appears only to be coincidentally related to the conspiracy, the court concludes that the act was not in pursuance of the agreement. Therefore, Bass cannot be held liable for Granger's act on this theory, and so the case against him must be dismissed.[46]

## D. REMEDY

Plaintiff has requested the court to grant him a variety of remedies for the violation of his first amendment rights. Clearly the most appropriate relief is an injunction requiring Granger to expunge, or cause to be expunged, all the Bass-Granger correspondence, all memoranda related to that correspondence, and any other references to plaintiff's criticisms of Commissioner Bass that are contained or may appear in any file maintained by the UTSSW or the University. Further, defendant Granger will be permanently enjoined from making any reference or allusion to this incident or the attendant legal actions when answering any employment inquiries received concerning plaintiff. Such injunctive relief will prevent plaintiff from suffering any future injury to his employment opportunities because of his exercise of his protected rights. By demonstrating that courts will not permit such violations of first amendment rights to go unredressed, this relief should also dissipate plaintiff's present fears of exercising those rights.

45. The conspiracy arose when Bass requested Granger to take some action against plaintiff, and Granger expressed his willingness to take whatever action he could.

46. The court is conscious of the fact that by dismissing the action against Bass, it is releasing from liability the defendant who had the most culpable intent to violate plaintiff's rights. Under the law, however, the court has no other choice. In addition to considering Bass' possible liability on the conspiracy theory discussed in the text, the court has also examined the law of agency, *Restatement (Second) of Agency*

§ 212 (1958), and of contributing tortfeasors, *Restatement (Second) of Torts* §§ 876–77 (1979), to make sure that no avenues of relief against the former commissioner were available. Under any of those theories the court believes that plaintiff's cause is defeated by the fact that Granger placed the materials in the files not to punish plaintiff as Bass desired, but pursuant to his policy so to place all items he received regarding faculty members. The court therefore reluctantly concludes that Bass cannot be held accountable for plaintiff's injury.

**44**

Plaintiff offered no proof that he suffered any actual injury as the result of the constitutional deprivation, and therefore he is not entitled to an award of compensatory damages. Nonetheless,

> courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–1054, 55 L.Ed.2d 252, 266 (1978). This court believes that first amendment rights, being central to our constitutional system, are just such "absolute" rights that must be "scrupulously observed." Accordingly, the court will award plaintiff nominal damages of one dollar. Plaintiff seeks to impose punitive damages upon defendant Granger, but the court does not believe that plaintiff has proven that Granger acted with "malicious and wanton disregard" of his constitutional rights. *See, e. g., Vetters v. Berry*, 575 F.2d 90, 96 (6th Cir. 1978). *See generally Carey v. Piphus, supra*, 435 U.S. at 257 n.11, 98 S.Ct. at 1049 n.11, 55 L.Ed.2d at 260–61. The court will therefore deny this request.

Finally, plaintiff has requested an award of attorneys' fees under the Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Plaintiff is clearly the prevailing party in this case as that term is defined by the Sixth Circuit in *Northcross v. Board of Education, supra*. He is therefore "entitled to recover attorneys' fees for 'all time reasonably spent on a matter.'" *Northcross v. Board of Education, supra*, 611 F.2d at 636. The court will await proper application by plaintiff before determining the exact amount of the award, and will entertain proof on this matter in conjunction with proceedings on the attorney fee award in the employment discrimination case. This award may be assessed against Granger in either his official or individual capacities. See *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

An appropriate order will be entered.