Karen LAUGHLIN, Plaintiff,

v.

METROPOLITAN WASHINGTON AIR-
PORTS AUTHORITY and Augus-
tus Melton, Jr., Defendants.

Civil Action No. 96cv1284–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 9, 1997.

Jerry W. Boykin, Redmon, Boykin & Braswell, Alexandria, VA, for Plaintiff.

Morris Kletzkin, Friedlander, Misler, Friedlander, Sloan & Herz, Washington, D.C., for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action, Karen Laughlin asserts that the Metropolitan Washington Airports Authority ("MWAA") fired her in retaliation for what she says was "participation" in a co-worker's Title VII claim. This retaliation, Laughlin contends, violated Title VII, constituted intentional infliction of emotional distress,[1] and produced the wrongful termination of her employment under Virginia law. Defendants filed a Motion to Dismiss, or in the alternative a Motion for Summary Judgment, claiming, in relevant part, that Laughlin failed to allege or establish an essential element of her Title VII retaliation claim. Namely, defendants contend that Laughlin has failed to show that she engaged in activity protected by Title VII. For the reasons set forth below, the defendants' Motion for Summary Judgment on the Title VII claim in Count I is granted. Laughlin's wrongful termination claim in Count III is also dismissed with prejudice.

## STATEMENT OF FACTS

Because this action involves Laughlin's alleged participation in a co-worker's Title VII claim, the facts begin, as they must, with a brief summary of the co-worker's underlying claim. On April 5, 1994, Kathy LaSauce ("LaSauce"), an Operations Officer employed by MWAA and acquaintance of Laughlin's, filed an informal complaint with the EEO officer for MWAA against William Rankin ("Rankin"), her supervisor. LaSauce alleged that Rankin had retaliated against her for testimony which she gave in support of another Operation Officer's EEO complaint against Rankin.

On April 6, 1994, LaSauce took her complaint to Augustus A. Melton, Jr. ("Melton"), the Washington National Airport Manager, who had oversight responsibility for the Operation Division, in which LaSauce and Rankin worked. Rankin also had approached Melton to discuss LaSauce's Complaint on an informal basis. LaSauce told Melton

---

1. Count II, the claim for intentional infliction of emotional distress, is asserted against MWAA and Augustus Melton, Airport Manager. The other two counts are asserted only against MWAA.

that Rankin had retaliated against her, and Melton informed LaSauce that Rankin had expressed concern with LaSauce's job performance. One month later, in May 1994, LaSauce filed a formal complaint of retaliation against Rankin with the MWAA EEO office, and an internal investigation into LaSauce's complaints was initiated in June. On August 25, 1994, LaSauce submitted her resignation, which was to become effective on September 19, 1994.[2]

While Melton was completing his consideration of LaSauce's complaint, Rankin announced his resignation to accept an offer of employment as the airport manager at El Paso, Texas. Before that, however, Melton had drafted a document to Rankin, entitled "Written Warning," in an effort to effect a voluntary and informal resolution of LaSauce's complaints. In sum, the Written Warning stated that, although Melton had not concluded that, in fact, Rankin had engaged in retaliation against LaSauce, the timing of, and the events associated with, the actions which Rankin had taken with respect to LaSauce gave "a reasonable appearance that these actions were motivated by retaliation."

The undisputed record is that the Written Warning was never signed by either Melton or Rankin. And, according to Melton's deposition testimony,[3] which was not rebutted by Laughlin, Melton never issued the Written Warning because: (1) Rankin was not willing to say that he had done anything that even appeared to be wrong; and (2) Melton did not feel that Rankin, in fact, had done anything wrong.[4]

Laughlin had no involvement in any of these events, officially or otherwise. But her actions in relation to the LaSauce case, which form the basis of the present action, must now become the focus of attention. Laughlin worked within the MWAA secretarial staff for Melton. According to Laughlin, she, like others on the secretarial staff, was entrusted with free access to Melton's office so that she could perform her job responsibilities. On or about September 29, 1994, in the performance of her job, Laughlin walked by Melton's desk and "noticed:" (i) the Written Warning, which was date stamped three weeks earlier, indicating to Laughlin, based upon her understanding of office procedure, that the document was in final form; and (ii) a copy of a letter from the Mayor of El Paso, Texas to Rankin, extending an offer of employment to Rankin.

Based upon the fact that the Written Warning and the letter from El Paso were together on Melton's desk and that the date stamp on the unsigned Written Warning was three weeks old, Laughlin concluded that somehow Rankin and Melton had colluded to suppress the results of the MWAA internal investigation of LaSauce's EEO complaint.[5] Her suspicions aroused, Laughlin removed the Written Warning and letter from Melton's desk, copied those documents, and replaced them on Melton's desk. She forwarded copies to LaSauce (who by then had resigned) along with a news-clipping about Rankin's new position and an MWAA job vacancy announcement for LaSauce's former position.[6] The cover letter from Laughlin to LaSauce stated, inter alia, "A few things I have come across and thought of you—you might find them of some interest!" The record is undisputed that LaSauce did not ask Laughlin for the documents. Laughlin, however, considered LaSauce as a friend.

**2.** Laughlin's Complaint alleges that LaSauce's resignation became effective September 16, 1994.

**3.** Melton's deposition was taken in connection with the LaSauce action, but filed in support of the defendants' motions in the present action.

**4.** Rankin also testified at his deposition, taken in connection with the LaSauce action, that he did not know of the existence of the Written Warning. Laughlin has offered nothing to contradict that assertion.

**5.** Indeed, Laughlin's Complaint alleges that Melton met with Rankin to discuss the Written Warning and that Melton agreed not to issue it because Rankin had learned that he had been accepted for the position of Airport Manager at El Paso, Texas. However, Laughlin offered no proof to support this allegation, which was noticeably absent from her affidavit.

**6.** A note on the job announcement stated "Boy, they got this out in a hurry!"

After learning that Laughlin had taken, copied, and disseminated the documents from Melton's desk without his consent, MWAA informed Laughlin that her employment would be terminated.[7] Laughlin was provided with an opportunity to respond, which she did in writing through her attorney. Notice of termination was issued on April 16, 1996. Laughlin did not file a grievance with MWAA, choosing instead to file a complaint with the EEOC, which declined to pursue her charge. This action ensued.

## STANDARD FOR SUMMARY JUDGMENT

Because the Court's decision depends upon matters outside the pleadings, the defendants' Motion to Dismiss will be considered as a Motion for Summary Judgment.[8] Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion:" and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' " that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); see also *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1338–39 (4th Cir.1992). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)); *see also Catawba Indian Tribe,* 978 F.2d at 1338–39.

In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Rather, that party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

After fully examining the pleadings and exhibits, and hearing the argument of counsel, the Court finds that the record, taken as a whole, could not lead a rational trier of fact to find for Laughlin on her Title VII retaliation claim. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## DISCUSSION

**A. To Prove A Prima Facie Case of Retaliation, Laughlin Must Show That She Engaged in Protected Activity**

Title VII's anti-retaliation provision makes it unlawful for an employer to retaliate

---

7. Several affidavits from Melton and MWAA employees stated that it is "well known that Mr. Melton's staff is not at liberty to remove documents from Mr. Melton's office and transit them to third persons, particularly persons outside the Metropolitan Washington Airports Authority, without Mr. Melton's express permission." *See* Defendants' Motion to Dismiss, Exhibits 7, 8, 9. Laughlin claims, however, that "There was no policy, either written or oral, given to employees regarding the confidentiality of documents and

records." *See* Plaintiff's Memorandum in Opposition, Exhibit 2.

8. Laughlin and the defendants offered affidavits to support their positions on the motions. Although discovery has not been conducted, Laughlin did not act under Fed.R.Civ.P. 56(f) to seek discovery in order to respond to the defendants' motion for summary judgment.

against an employee for opposing an employer's discriminatory practices or for participating in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e–3(a). In pertinent part, the statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has *opposed any practice made* an *unlawful* employment practice ... *or* because he has ... *assisted, or participated* ... in any manner *in an investigation, proceeding or hearing under this subchapter.*

42 U.S.C. § 2000e–3(a) (emphasis added).

To establish a prima facie case of retaliation, Laughlin must show that: "(1) [s]he engaged in protected activity; (2) [her] employer took adverse employment action against [her]; and (3) a sufficient causal connection existed between [her] protected activity and [her] employer's adverse employment action." *Hopkins v. Baltimore Gas and Electric Company*, 77 F.3d 745, 754 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) (citing *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991)); *see also Beinlich v. Curry Development Inc.*, 1995 WL 311577 **1 (4th Cir.1995) (unpublished opinion) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)).

The resolution of this motion for summary judgment turns on Laughlin's contention that she was engaging in "protected activity" when she took, copied, and sent her employer's documents to LaSauce. But, Laughlin's papers are ambiguous about whether she relies upon Section 2000e–3(a)'s opposition clause or its participation clause in support of this claim.

This ambiguity bears considerable significance and must first be resolved before examining the merits of Laughlin's claim. Indeed, "[w]hether an activity [is] 'opposition' or 'participation' is often of critical importance in Title VII retaliation cases because the scope of protection afforded by the two clauses is different. While the 'participation' clause covers *a narrower range of activities than the other,* it gives those activities stronger protection than the 'opposition' clause provides." *Croushorn v. Board of Trustees of University of Tennessee*, 518 F.Supp. 9, 21 (M.D.Tenn.1980) (citations omitted) (emphasis added).[9]

Under the participation clause, an employee may not be retaliated against for assisting or participating *"in an investigation, proceeding, or hearing* under th[e] subchapter." *See* 42 U.S.C. § 2000e–3(a) (emphasis added). The purpose of this clause " 'is to protect the employee who utilizes the tools provided by Congress to protect his rights.' " *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir.1990) (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978)); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989); *Croushorn*, 518 F.Supp. at 22–23 ("the purpose of the 'participation' clause is to protect all forms of access to the EEOC ..."). And, "[u]nlike the opposition clause, the participation clause ... grants an absolute privilege for filing a claim with the EEOC. There is no requirement in the statute that the discrimination claim be meritorious, and the courts have not imposed such a limitation." *Blizzard v. Newport News Redevelopment and Housing Authority*, 670 F.Supp. 1337, 1339 (E.D.Va.1984) (citations omitted).[10]

9. "Courts have not always taken care to specify whether a particular claim is cognizable under the 'participation' or 'opposition' clause." *Croushorn* 518 F.Supp. at 22 n. 8 (citing *Eichman v. Indiana State University Board of Trustees*, 597 F.2d 1104 (7th Cir.1979); *Berio v. EEOC*, 18 FEP 1213 (D.D.C.1979); *Hunter v. Stetson*, 444 F.Supp. 238 (E.D.N.Y.1977); *Kornbluh v. Stearns & Foster Co.*, 73 F.R.D. 307 (S.D.Ohio 1976). *But c.f. Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir.1978); *EEOC v. Johnson Co.*, 18 FEP 896 (D.Minn.1978)).

10. *C.f. EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66, 71–2 (S.D.N.Y.1975). In interpreting the "assisting" and "participating" language, the court in *Kallir* found that "[u]nder some circumstances, an employee's conduct in gathering or attempting to gather evidence to support his charge may be so excessive and so deliberately calculated to inflict needless economic hardship on the employer that the employee loses the protection of section 704(a), just as other legitimate civil rights activities lose the protection of section 704(a) when they progress to deliberate and unlawful conduct against the employer."

■ Under section 2000e–3(a)'s opposition clause, it is unlawful to retaliate against an employee for opposing an unlawful employment practice committed by an employer. Furthermore, "[t]o fall under the protection of the opposition clause in § 704(a), behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Company,* 647 F.2d 441, 448 (4th Cir.1981) (citations omitted).

■ The conclusory language of Laughlin's Complaint describes the taking, copying and dissemination of Melton's documents as "participation" or "assistance" in the internal MWAA investigation of LaSauce's Title VII complaints. However, the more particularized pleadings, which Laughlin filed in response to the defendants' motions, present a scenario which is more appropriately addressed under the "opposition" clause.

At the outset, it must be remembered that, at the time of Laughlin's actions, LaSauce had resigned, thus raising a question as to whether the internal investigation by MWAA was even pending when Laughlin took the documents. Nor had LaSauce, at that point, filed suit. Thus, it is questionable whether any "investigation, proceeding, or hearing under" Title VII involving either Laughlin or LaSauce were underway when Laughlin took, copied and disseminated the documents. Moreover, by her own admission, Laughlin did not send the MWAA documents to the EEO officer who was conducting the internal MWAA investigation respecting LaSauce's complaints. Neither was Laughlin a witness in the LaSauce investigation or a participant in the investigation in any other manner.

Considering those facts and the reasons given by Laughlin for her actions,[11] Laughlin's activities are best addressed as "opposi-

tion" rather than "participation" or "assistance" in a proceeding or investigation. *See Croushorn,* 518 F.Supp. at 24 (the opposition clause "is often relied upon in cases in which application of the participation clause to the employee's conduct is considered dubious.") (citations omitted). This conclusion finds further support from the fact that Laughlin cites no decision which has interpreted the "participation clause" in § 2000e–3(a) to permit an employee to copy an employer's documents and provide them to a former co-worker who is engaged in litigation with the employer. Instead, Laughlin finds support in cases which have interpreted Section 2000e–3's "opposition clause." Finally, this approach accords Laughlin the benefit of all inferences to which she is entitled under summary judgment jurisprudence because it permits Laughlin's claim to proceed without a showing that there was underway an investigation, proceeding, or hearing under Title VII.

### B. Not All Opposition Activity Constitutes Protected Activity Under Title VII

Not all "opposition" activity is protected under Title VII. For instance, it has been held that unlawful activity falls outside of the statute's protective umbrella. *See Green v. McDonnell Douglas Corp.,* 463 F.2d 337 (8th Cir.1972) (holding that unlawful activities, such as "stall-in" demonstrations, are not protected under § 2000e–3(a)), *vac. on other grounds,* 411 U.S. 792–803, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) ("Nothing in Title VII compels an employer to absolve and rehire one who has engaged in ... deliberate, unlawful activity against it."); *see also King v. Illinois Bell Telephone Co.,* 476 F.Supp. 495, 499 (N.D.Ill.1978) (finding that the "opposition clause of section 704(a) is limited to lawful activities"). In this action, there has been no showing, or even a claim, that Laughlin's actions were unlawful.[12]

---

11. Laughlin claims that, of her own volition, she took the documents because she believed Rankin and Melton were attempting to "cover-up" the results of the MWAA internal investigation of the LaSauce matter in violation of MWAA policy. She further believed that her actions were necessary to preserve the documents as evidence.

12. Therefore, the pleadings in this action render it unnecessary to decide whether Laughlin's taking of her employer's documents, which are not alleged to have intrinsic value (such as trade secrets), was unlawful.

However, certain lawful activities also have been found not to constitute "protected activity" under Title VII. For instance, the First Circuit has held that, although the statute and legislative history are silent as to the scope of protected "opposition,"

> Congress certainly did not mean to grant sanctuary to employees to engage in political activity for women's liberation on company time, and an employee does not enjoy immunity from discharge for misconduct merely by claiming that at all times she was defending the rights of her sex by "opposing" discriminatory practices. *An employer remains entitled to loyalty and cooperativeness from employees:*
>
>> [M]anagement prerogatives ... are to be left undisturbed to the greatest extent possible. Internal affairs of employers ... must not be interfered with except to the limited extent that correction is required in discrimination practices.
>
> \*    \*    \*    \*    \*    \*
>
> It is less clear to what extent militant self-help activity falling between these two poles, such as particular types of on-the-job opposition to alleged discrimination, vociferousness, expressions of hostility to an employer or superior and the like, are protected.... In such instances, we think courts have in each case *to balance the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers* in the objective selection and control of personnel.

*Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 230–31 (1st Cir.1976) (emphasis added); *see also King*, 476 F.Supp. at 501 (holding that "the opposition clause of section 704(a) does not protect strikes by union members during working hours in violation of an existing collective bargaining agreement"); *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 4 (1st Cir.1993) ("the right to oppose discrimination is not a right to refuse to work on account of

discrimination ... a plaintiff goes beyond the scope of protected opposition when he damages the basic goals and interests of the employer who has a legitimate interest in seeing that its employees perform their work well.").

The Fourth Circuit also has recognized that the opposition clause does not protect all lawful activity. Instead, this Circuit has held that,

> [The opposition clause] was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work ... An employer must retain the power to discipline and discharge disobedient employees.

*Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citations omitted) (Applying *Hochstadt* balancing test); *see also Wilson v. Milliken & Co.*, 1993 WL 509484 (4th Cir.1993) (unpublished opinion) (applying balancing test and holding that refusal to work is not protected).[13]

At least two courts have used the same sort of balancing test adopted in *Hochstadt* and *Armstrong* to determine whether an employee's surreptitious copying and dissemination of employer documents constitutes protected opposition activity. In both cases, the activity was found unprotected. Nevertheless, Laughlin claims that the reasoning of these cases support her actions, or in the alternative, that the facts of her case are distinguishable.

For instance, in *Jefferies v. Harris County Community Action Assn.*, 615 F.2d 1025 (5th Cir.1980), the Fifth Circuit adopted a balancing test to ascertain the reach of the opposition activity language in the anti-retaliation provision of Title VII. Confronted with the firing of an employee who claimed to have copied and disseminated her employer's records purportedly to oppose an unlawful employment practice, the Fifth Circuit observed first that "it is clear that not all 'opposition' activity is protected under § 704(a)" and then held:

> Rather the courts have required that the *employee conduct be reasonable in light of*

---

**13.** Unpublished opinions are not precedent in the Fourth Circuit. Nonetheless, they are useful

analytical tools.

*the circumstances, and have held that the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare.*

\* \* \* \* \* \*

Jefferies has not shown any need for surreptitious copying and dissemination of the documents. She has not established that HCCAA would have destroyed the documents had she not taken action to preserve them, and has not made a colorable claim that she reasonably believed there was a need to act as she did. Nor has Jefferies attempted to show that the grievance procedure in place at HCCAA at the time of her actions was inadequate. Under these circumstances, we hold that HCCAA's interest in protecting the confidentiality of its records outweighs Jefferies' right to protect her interests by opposing perceived employment discrimination.

*Id.* at 1036–37 (citations and inner quotations omitted) (emphasis added).

Similarly, in *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756 (9th Cir.1996), an employee was discharged for rummaging through his supervisor's office for confidential documents, copying them and giving them to a co-worker. The Ninth Circuit rejected the employee's claim that, because these actions were taken for the purported purpose of preserving evidence, the actions were protected by the ADEA's anti-retaliation provisions, which are virtually the same as those in Title VII.[14] In so doing, the court held:

O'Day committed a serious breach of trust, not only in rummaging through his supervisor's office for confidential documents, but also in copying those documents and showing them to a co-worker. Like any employer, McDonnell Douglas has a strong interest in maintaining employee morale, and in discouraging this sort of behavior. To be sure, O'Day also has a legitimate interest in preserving evidence of McDonnell Douglas' unlawful employment practices, but that doesn't explain why he showed the purloined documents to a co-

worker who had been slated for lay-off, or why he felt compelled to preserve evidence of McDonnell Douglas' lay-off decisions. At the time he stole the 'totem' list, O'Day had only been denied a promotion; he had not been laid off, nor had he been given any indication that he would be. In balancing an employer's interest in maintaining a 'harmonious and efficient' workplace with the protections of the anti-discrimination laws, we are loathe to provide employees an incentive to rifle through confidential files looking for evidence that might come in handy in later litigation. The opposition clause protects reasonable attempts to contest an employer's discriminatory practices; it is not an insurance policy, a license to flaunt company rules or an invitation to dishonest behavior.

*Id.* at 763.

In sum, *Jefferies* and *O'Day* used a balancing test to determine whether an employee's taking, copying and dissemination of employer documents would constitute protected activity under the discrimination laws. Laughlin asserts that application of the same test to her claim precludes an award of summary judgment here. The Fourth Circuit has not yet decided if a balancing test should be used to determine whether the type of activity in which Laughlin engaged is protectable.

For the reasons which follow, the Court concludes that the balancing test, as articulated by *Jefferies* and *O'Day* is inappropriate where, as here, the employee claims that the unauthorized copying and dissemination of an employer's documents in breach of an employee's duty is a protected activity under Title VII's anti-retaliation provision.

**C. Misappropriation of An Employer's Documents Is Presumptively Not Protected Activity Under The Anti–Retaliation Provision of Title VII**

Both *O'Day* and *Jefferies* reached the result that an employee's need to copy and disseminate an employer's documents was out-weighed by an employer's interests in protecting the confidentiality of such docu-

---

**14.** The employee claimed that his actions constituted "participation" in the investigation of an

unlawful employment practice or, at the very least, opposition activity.

ments and in maintaining a harmonious and efficient workplace. However, the problem with *Jefferies* and *O'Day* lies not with the result, but with the method employed to analyze the issue. Indeed, by using a balancing test to determine whether an employee's taking, copying and dissemination of employer documents were protected opposition activity, the courts in *Jefferies* and *O'Day* equated surreptitious, dishonest and disloyal behavior with open opposition, treating dishonesty with the same substantive and procedural dignity reserved for honest, open, activity.

■ These two very different kinds of conduct are not at all equatable either in fact or in law. To the contrary, the analysis, in cases of this sort, should proceed from the premise that it is a breach of the employee's obligations of honest and faithful service to purloin and disseminate the employer's documents, particularly those which deal with matters so intrinsically sensitive as personnel disputes. That approach necessarily flows from the fundamental premise that an employee owes the employer a duty of loyalty and faithful service which, of course, is a central tenet of the employment relationship. *See National Legal Research Group v. Lathan,* 1993 WL 169789, *5 (W.D.Va.1993) ("An employer has the right to expect loyalty from his employees so long as the employment continues. The law implies an agreement on the part of the employee to serve faithfully."), *aff'd by unpublished opinion,* 42 F.3d 1386 (4th Cir.1994) (citing *Bull v. Logetronics, Inc.* 323 F.Supp. 115, 133 (E.D.Va. 1971)). .

■ An important corollary to this principle is that "[i]n addition to [a] duty of loyalty, an employee is a fiduciary with respect to the information which comes to him in the course of his employment." *National Legal Research Group,* 1993 WL 169789 at *5; *see also Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (noting that under the common law, "even in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment.") (inner quotations omitted). " 'Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.' " *Id.* at 26, 108 S.Ct. at 320 (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1 at 260 (rev. ed. 1986)).

Although these principles most often come into play in cases involving proprietary materials purloined by an employee, they are no less applicable to an employee's obligations with respect to sensitive, non-proprietary documents. It is difficult to discern a topic more deserving of confidential protection than a supervisor's unsigned, undelivered, tentative assessment of a claim of discrimination against a subordinate. Exceedingly serious legal, business and personal ramifications inevitably ensue such assessments. And, therefore, they should be made only after careful thought and deliberation of the facts. An important part of that deliberative process is to reduce the issues to writing in order to test the veracity of the asserted facts and to measure the judgments which legitimately and logically can be made about them. The preparation and editing of documents of this sort must be protected if the process is to be useful in arriving at supportable and fair decisions. An employee who is entrusted with access to documents involved in that process, whether the documents are in progress or awaiting final signature,[15] is obligated to respect, not to exploit, the employer's confidences, of which she becomes aware in performing her job. This principle holds particular significance where, as here, the employee occupies a position of trust of the scope held by Laughlin.

■ Thus, Laughlin's taking, copying and dissemination of her employer's sensitive documents clearly constituted a breach of the fiduciary duty owed to MWAA. Such actions

---

15. It, of course, is not unusual for the preparer of documents to change his or her mind before dissemination. And, it is not at all unusual to draft a document in the strongest possible language to test the validity of its text.

also breached her duty to be loyal and to provide faithful service to her employer. The deliberate breach of these duties, which, here, may best be described as "misappropriation,"[16] should not be treated as if it enjoyed a stature which it clearly does not enjoy elsewhere in the law—that of reasonable conduct which is worthy of balancing against an employer's legitimate interests. Rather, this type of conduct, which on its face is dishonest and disloyal, should be presumed to fall outside of the protection afforded by Title VII for the following reasons.

First, in conducting the balancing test outlined by *Jefferies* and *O'Day*, it is difficult to fathom a situation where an employee's misappropriation of an employer's confidential documents would ever outweigh an employer's legitimate interests in preserving confidentiality and in maintaining an efficient workplace. Hence, where misappropriation occurs, the balance will generally be struck in favor of the employer.[17] Creating a presumption that the misappropriation of an employer's documents is unprotected by Title VII, simply codifies this truism.

Second, a presumption that the misappropriation of an employer's documents is unprotected activity appropriately encourages employees to first resort to the numerous, lawful and honest avenues available to permit "opposition" (or even "assistance"). For example, an apprehensive employee may approach a respected manager about the problem or bring the issue to the attention of executives or the board of directors.[18] Another course is to present the problem to the employer's internal grievance office, the EEOC, or any other agency with authority over the matter. Or, an employee may raise the matter with her own counsel or counsel for other employees. In most instances, recourse to these legitimate approaches will adequately permit opposition to an unlawful practice. At the same time, recourse to such legitimate measures will afford adequate protection to the employee against reprisal without encouraging the kind of employee conduct that will undermine the employee's obligation to provide faithful, honest services to the employer.[19] Finally, it is appropriate to presume that misappropriating an employer's documents is not protected activity because the law should not create incentives for employees to breach their fiduciary duties.

Before concluding, however, it also must be recognized that an employer has a duty to refrain from engaging in activity violative of Title VII. And, when an employer's breach of that duty is at issue, an employee should be given an opportunity to overcome the presumption that misappropriation is unprotected. To do this, an employee must show specific evidence that there existed no alternative to the misappropriation. Only after this showing is made, should the balancing of interests, as proposed in *Hochstadt* and applied in *Jefferies* and *O'Day*, be performed. This procedure accords the duties of honest and faithful service, which underpin the employment relationship, their proper place while allowing room for circumstances in which the nature of an employer's breach of duty leaves the employee no choice but to resort to dishonest and disloyal conduct.[20]

---

**16.** An accepted meaning of misappropriation is "to appropriate wrongly or misapply in use." *Webster's Third New International Dictionary of the English Language Unabridged* (1986).

**17.** Even *Jefferies* and *O'Day* recognized the unassailable premise that, in order for an employee's activity to be protected under Title VII, the behavior must be reasonable. *See O'Day*, 79 F.3d at 763 (ADEA). ("The opposition clause protects reasonable attempts to contest an employer's discriminatory practices."); *Jefferies*, 615 F.2d at 1036–37 (". . . courts have required that the employee conduct be reasonable in light of the circumstances . . ."). It will be rare to find a situation where it is reasonable for an employee to misappropriate an employer's documents and disseminate them to a former co-worker.

**18.** To suggest otherwise would, in effect, treat all levels of all companies as inherently unreliable—an insupportable premise.

**19.** It would be unlikely and, indeed, foolish for an employer to risk retaliation against an employee, whose opposition was channelled in such a legitimate way, or to destroy the evidence once the matter was properly directed to the attention of responsible management.

**20.** No matter how nicely put, the "employee's need" component of the *Jefferies* and *O'Day* balancing test is simply an acknowledgement that disloyal or dishonest conduct sometimes is the only recourse available.

In sum, the misappropriation, or unauthorized copying and distribution of employer documents, constitutes a breach of an employee's duty of honesty and loyalty. Thus, to establish a prima facie case, an employee who engages in misappropriation must overcome the presumption that such activity is not protected under Title VII's retaliation clause. This is to be done by a specific showing that there existed no alternative to the dishonest, disloyal conduct sought to be asserted as protected activity. Laughlin has not done that.[21] No reasonable jury could, therefore, find in her favor, and MWAA is entitled to judgment as a matter of law.

**D. Alternatively, Laughlin Has Not Shown that She Reasonably Believed She Had a Need To Misappropriate MWAA's Documents—And Laughlin's Interests Are Outweighed by MWAA's Interests**

The defendants would be entitled to summary judgment even were the court to use the balancing test and the reasoning of the decisions in *Jefferies* and *O'Day*, which Laughlin asserts support her actions. Specifically, Laughlin notes that the Fifth Circuit in *Jefferies* upheld the district court's decision, that the copying and dissemination of the employer's records was not protected activity, only after finding that the plaintiff there had failed to demonstrate a need for engaging in the activity. For instance, the employee did not show that the documents would have been destroyed or that the grievance procedure was inadequate. Based upon this reasoning, Laughlin concludes that the facts of her case may be distinguished from *Jefferies* because she has demonstrated a need within the meaning of that opinion. This need, Laughlin claims, stems from the fact that Laughlin believed that Melton discussed the Written Warning with Rankin and that Melton agreed not to issue it because Rankin recently had been offered a new job.

This, says Laughlin, led her to deduce that Melton and Rankin had colluded to suppress the Written Warning.

This unsupported assertion of subjective belief by Laughlin does not carry the day under familiar summary judgment principles. In that regard, it is telling that Laughlin did not even recite her "collusion theory" in her affidavit. And, Laughlin also failed to offer any evidence to support her assertion that she reasonably believed she needed to preserve the documents at issue. The only facts that Laughlin could recount to support her actions were that the Written Warning was three weeks old when she took it, that it was date stamped indicating that it was in final form, and that a copy of the letter from El Paso to Rankin was on Melton's desk alongside the Written Warning. These facts simply do not show that Laughlin needed to preserve the documents, even under the approach taken in *Jefferies*. To find otherwise, would, as *O'Day* rightly explains, encourage employees to rifle through employers' desks and transform Title VII into a license to purloin. *See O'Day*, 79 F.3d at 763.

Laughlin further contends that the MWAA's failure to produce the Written Warning in the discovery phase of LaSauce's civil action conclusively demonstrates that the document was in fact destroyed. This argument also misses the mark. The evidence upon which Laughlin relies to prove that the document was destroyed is a *motion in limine* to suppress the Written Warning in the LaSauce case. This *motion in limine* was filed almost two years after Laughlin's misappropriation, and thus does not support Laughlin's claim that, when she took the documents, she reasonably believed that she needed to preserve them.[22] It is also difficult to see why MWAA would be under a duty to retain the Written Warning which was unsigned and never issued. Certainly,

---

21. Thus, balancing is unnecessary here because Laughlin has not overcome the presumption.

22. Laughlin also claimed that another indication of an attempt to hide the document was Melton's deposition testimony that the warning was never printed and that Laughlin must have taken it from his computer. This allegation is wholly unsupported by the deposition testimony. Contrary to Laughlin's interpretation, Melton did not say the document was never printed, rather he stated that *he did not print it,* that he had given it to his secretary for drafting in final form, and that *as far as he knew,* it was in her computer and was never made in hard copy form.

there is nothing suspicious in destroying documents of that sort.

Finally, the Court finds that Laughlin has failed to show that the grievance procedure at MWAA was inadequate. Indeed, it is difficult to imagine that employee misappropriation of an employer's documents could ever be justified on such a notion. Moreover, the only evidence of such "inadequacy" are claims in Laughlin's affidavit that she failed to ask Melton about the Written Warning because she believed that Melton would have taken adverse action against her and that she did not approach the EEO officer because she believed that he would have informed Melton. Laughlin's unsupported allegations to this end are entitled to no inference to overcome summary judgment. "Even though all doubts must be resolved in [plaintiff's] favor, allegations alone will not defeat summary judgment." *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890 (10th Cir. 1994). That is certainly true of the rather remarkable notion asserted here by Laughlin.

For the foregoing reasons, Laughlin is unable to satisfy the balancing test prescribed by *Jefferies* and *O'Day*. Thus, even if they supply the controlling analytical framework, the defendants are entitled to summary judgment.

### E. Summary

In conclusion, where, as here, an employee deliberately violates the duty of loyalty and faithful service owed to her employer by misappropriating her employer's documents, it is her obligation to overcome the presumption that her actions are not protected under Title VII by offering specific evidence that no alternative recourse existed. Laughlin has failed to meet that burden. Alternatively, Laughlin has failed to show sufficient evidence to support her claim even under the balancing test which she proposes for use in measuring the adequacy of her opposition to summary judgment.

For these reasons, Laughlin's misappropriation of the confidential information at issue was not "protected" under Title VII, and no rational jury could find in her favor. Thus, defendants are entitled to summary judgment on Count I.

### TORT CLAIMS

Laughlin's complaint also included common law tort claims. Specifically, Count II charged the defendants with intentional infliction of emotional distress, and Count III charged MWAA with wrongful termination under Virginia common law.

In Count III of her complaint, Laughlin alleged that her firing constituted wrongful termination under the common law of Virginia. Virginia follows the employment at-will doctrine, under which an employer may terminate an employee for any reason or no reason at all. However, this doctrine does not apply if an employee is terminated in violation of a public policy. Laughlin claims that her case falls within this public policy exception because, if her activities were protected by Title VII, her firing would violate public policy. Even assuming the validity of Laughlin's theory, her argument fails because the Court has concluded that Laughlin was not engaged in protected activity when she took, copied and disseminated her employer's documents. Consequently, the firing of Laughlin for such activity did not violate Title VII, and her wrongful termination claim, in Count III, must therefore be dismissed with prejudice.

Section 1367(c) of Title 28, United States Code, provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. Count I is the only count over which this Court has original jurisdiction. And, having granted summary judgment to the defendants on that Count, the Court declines under 28 U.S.C. § 1367(c)(3) to exercise jurisdiction over Laughlin's state law intentional infliction of emotional distress claim. Hence, Count II of Laughlin's Complaint is dismissed without prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.